994 F.2d 49
 37 Fed. R. Evid. Serv. 103
 Eliezer Moshe MALEK and Malke Malek,
Plaintiffs-Appellants-Cross-Appellees,
v.
FEDERAL INSURANCE COMPANY; Sea Insurance Company, Limited,
Defendants-Appellees-Cross-Appellants.
 No. 742, Dockets 92-7782, 92-7858.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 30, 1992.
Decided April 30, 1993.
 
 Eugene I. Farber, White Plains, NY (Steven L. Segall, Hinda Keller Farber, Katz, Kleinbaum, Farber & Segall, White Plains, NY, of counsel), for plaintiffs-appellants-cross-appellees.
 Paul Kovner, New York City (Franklin D. Tell, Kenneth R. Feit, Tell, Cheser & Breitbart, New York City, of counsel), for defendants-appellees-cross-appellants.
 Before OAKES, MINER and McLAUGHLIN, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Plaintiffs-appellants-cross-appellees Eliezer Moshe Malek and Malke Malek ("the Maleks") appeal from a judgment entered after a jury trial in the United States District Court for the Southern District of New York (Gagliardi, J.) dismissing their complaint. The Maleks, a married couple, commenced this action to recover the proceeds of their fire insurance policy after defendant-appellee-cross-appellant Federal Insurance Company ("Federal") rejected their claim. The district court dismissed the Maleks' complaint after the jury returned a verdict, the jury having found that the Maleks concealed or misrepresented material facts during Federal's investigation of the fire that destroyed their property and that the Maleks intentionally caused the fire.
 
 
 2
 The Maleks contend that the district court erred in, inter alia, excluding the relevant testimony of a social worker who was prepared to testify on the basis of her personal knowledge and business records; sequestering the Maleks' expert during the testimony of the defendants' expert, where the presence of the Maleks' expert was essential to the Maleks' cross examination of the defendants' expert; and permitting defense counsel to cross examine a witness about his religious affiliation and the religious affiliation of his clients. For the reasons set forth below, we agree with the Maleks that the district court erred in making these rulings and that these errors substantially affected the outcome of the trial.
 
 BACKGROUND
 A. The Fire
 
 3
 The Maleks owned a house in Highland Mills, New York and rented it to Mr. and Mrs. Leo Agrillo. The house was insured by defendant-appellee-cross-appellant Sea Insurance Company, Limited ("Sea"), a subsidiary of Federal. In 1988, the Maleks commenced a landlord-tenant proceeding against the Agrillos and in June 1989 obtained a warrant of eviction against them. On July 5, 1989, the Agrillos' eviction date, Deputy Sheriff Anthony Patricola inspected the house and confirmed that it was vacant.
 
 
 4
 On July 10, 1989, the house was destroyed by fire. The Maleks submitted a claim for the fire loss to Sea for $264,766. In March 1991, after a lengthy investigation, Federal rejected the Maleks' fire loss claim.[1] The Maleks brought an action against both Sea and Federal for breach of the fire insurance policy issued by Sea.
 
 B. The Trial
 
 5
 During trial, defendants contended they were not obligated to pay the Maleks' fire loss claim because the fire was incendiary in origin; the Maleks were responsible for the arson; and the Maleks had misrepresented and concealed material facts and circumstances during the investigation of the fire. The Maleks argued that they did not lie or misrepresent facts to the insurance companies during the course of the investigation and that the fire was not a result of arson. Rather, the Maleks alleged that the fire may have been caused by an electrical malfunction or accidentally may have been set by the Agrillos. The Maleks sought to demonstrate that the Agrillos may have been responsible for the fire because the Agrillos engaged in cult activities involving the use of candles and fire; a young woman had suffered second degree burns on the premises some time before the July 10 fire; and the Agrillos had access to and were present in the house after July 5, 1989--the date Deputy Sheriff Patricola confirmed that the house was vacant--and before July 10, 1989--the date of the fire.
 
 1. The Testimony of the Social Worker
 
 6
 To support their contention that the Agrillos may have set the fire, the Maleks attempted to introduce the testimony and case notes of Carol Barber, a social worker for the Orange County Department of Social Services who handled the case file concerning the Agrillo children. Barber was prepared to testify that the Agrillos had continued access to the premises; the Agrillos engaged in cult activities; and that a young woman had sustained second-degree burns at the premises. She also would have supported her testimony that the Agrillos had access to the house after the eviction date by submitting photographs, taken in the house by Mrs. Agrillo on July 6 or 7, 1989, which depicted a container of milk that had not yet reached its expiration date. The district court excluded Barber's testimony in toto.
 
 2. Sequestering the Maleks' Expert Witness
 
 7
 To show the absence of arson, the Maleks presented the testimony of Thomas Curley, a taxi driver on duty in the vicinity at the time of the fire. Curley claimed that the color of smoke from the fire was white. The color of the smoke was relevant because black smoke indicates the presence of accelerants, which are often used by arsonists, while white smoke indicates the absence of accelerants.
 
 
 8
 To refute this testimony and to establish arson as the cause of the fire, the defendants called a fire expert, David Redsicker. The Maleks sought permission from the court to have their fire expert, Fire Chief George Friedell, present in the courtroom during Redsicker's testimony in order to aid their counsel in cross examining Redsicker. The district court denied the Maleks' request and ordered all witnesses to leave the courtroom.
 
 
 9
 Redsicker testified that the fire was caused by arson. Although a laboratory analysis of debris found no accelerants present, Redsicker asserted that either water from fire fighting could have washed accelerants away or accelerants could have burned off due to the intensity of the fire. After returning to the courtroom, Friedell testified that accelerants could not be washed away and that, despite the intensity of the fire, small, solid particles would remain. The Maleks also disputed whether Redsicker conducted a proper inspection of the scene after the fire. The Maleks contended that Redsicker failed to "overhaul," or to sift through, all of the debris and failed to look for evidence such as candles or other evidence of cult activities.
 
 
 10
 Redsicker introduced several photographs taken at the scene of the fire. The photographs showed that copper wiring, but not hollow copper tubing, had melted. Redsicker testified that the fire was "very intense," a conclusion reached during his trial testimony but not explicitly stated in his reports provided to the Maleks prior to trial. This portion of his testimony was relevant because the melting of the copper wire indicated arson. However, Redsicker's theory did not explain why the hollow copper tubing failed to melt despite the intensity of the fire. Friedell's absence from the courtroom precluded him from informing the Maleks' counsel of this inconsistency. Counsel for the Maleks failed to cross examine Redsicker about why the copper tubing had not melted.
 
 
 11
 3. Impeaching a Witness by Using His Religious Beliefs
 
 
 12
 To rebut the defendants' contention that they had a financial motive to set fire to the premises, the Maleks called an accountant, William Schneck, to testify as to their financial stability. During the cross examination of Schneck, the following colloquy took place:
 
 
 13
 Q. Was your principal a member of the Hassidic [sic] community in the business transaction you had with Mr. Malek?
 
 
 14
 [The Maleks' Attorney]: Objection, your Honor.
 
 
 15
 THE COURT: Overruled.
 
 
 16
 A. Yes.
 
 
 17
 Q. Do you act as a CPA for other members of the Hassidic [sic] community?
 
 
 18
 [The Maleks' Attorney]: Objection.
 
 
 19
 THE COURT: Overruled.
 
 
 20
 A. Not just Hassidic [sic] people.
 
 
 21
 Q. I didn't ask you that.
 
 
 22
 A. In that respect, yes. There's a number of people that I do that for.
 
 
 23
 Q. You've been a professor at Tuoro [sic] University for eight years, is that correct?
 
 
 24
 A. Yes.
 
 
 25
 Q. And that's part of the Yeshiva University system, isn't [it]?
 
 
 26
 [The Maleks' Attorney]: Objection.
 
 
 27
 THE COURT: I'll permit it.
 
 
 28
 A. It's not a member, no.
 
 
 29
 Q. Isn't it affiliated with organized Jewish institutions?
 
 
 30
 [The Maleks' Attorney]: Objection.
 
 
 31
 THE COURT: Sustained.
 
 
 32
 The district court gave no limiting instruction to the jury to indicate that it was improper for the defendants to impeach Schneck's credibility with evidence of his religious affiliations or beliefs.
 
 
 33
 After deliberating for approximately an hour-and-a-half, the jury delivered a verdict in favor of the defendants, and the district court dismissed the Maleks' complaint.
 
 DISCUSSION
 A. Testimony of the Social Worker
 
 34
 The district court excluded Barber's testimony, and it excluded her case notes on the ground they were not business records and thus were inadmissible hearsay. The business records exception to the hearsay rule allows for the admission of the following evidence for the purpose of proving the truth of its contents:
 
 
 35
 A memorandum, report, record, or data compilation ... of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity.
 
 
 36
 Fed.R.Evid. 803(6). We review a district court's exclusion of hearsay for abuse of discretion. United States v. Torres, 901 F.2d 205, 234 (2d Cir.), cert. denied, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).
 
 
 37
 Barber's case notes were records kept by the Orange County Department of Social Services in the regular course of business. These case notes were taken in the normal course of business, as Barber was the social worker responsible for the case file concerning the Agrillo children. The notes were made close to the time of the events they recorded and were, in part, based on Barber's personal knowledge and observations. Thus, we find that Barber's records should have been admitted under the business records exception to the hearsay rule. See United States v. Ray, 930 F.2d 1368, 1370 (9th Cir.1990) (testimony of a welfare fraud investigator about the contents of a welfare file was admissible under Rule 803(6)), cert. denied, 498 U.S. 1124, 111 S.Ct. 1084, 112 L.Ed.2d 1189 (1991); see also United States v. King, 613 F.2d 670 (7th Cir.1980) (social security investigative reports held admissible under Rule 803(6)).
 
 
 38
 We also conclude that the district court should have admitted Barber's testimony about the use of fire in cult activities that took place on the premises during the Agrillos tenancy because her testimony would have been relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. As a general rule, "[a]ll relevant evidence is admissible." Fed.R.Evid. 402.
 
 
 39
 Here, Barber was not permitted to testify regarding any personal knowledge she may have had bearing on the second-degree burns allegedly sustained by a woman who claimed to have been burned at the Agrillos' house. Such testimony would have been relevant because it had a tendency to make the existence of the Maleks' theory that the Agrillos were responsible for the fire more probable than it would have been had Barber not testified. Thus, because Barber's testimony was not prejudicial, cumulative, or misleading, see Fed.R.Evid. 403, the district court erred in excluding this relevant testimony.
 
 
 40
 We also find that the district court erred in preventing Barber from testifying about the photographs that Mrs. Agrillo took and sent to the Department of Social Services. Barber's testimony about Mrs. Agrillo's photographs and the photographs themselves would have contradicted the defendants' argument that the Agrillos could not have started the fire because the fire occurred five days after Sheriff Patricola confirmed the house was vacant. Barber's proffered testimony, combined with the photographs, also provided support for the Maleks' theory that the Agrillos may have started the fire accidentally during one of their cult activities. The proffered testimony and photographs directly implicated the issues of opportunity and causation as it related to the defendants' arson defense.
 
 
 41
 B. The Sequestering of the Maleks' Expert Witness
 
 
 42
 Fed.R.Evid. 615 provides that a district court may sequester witnesses to prevent them from hearing the testimony of other witnesses. Rule 615(3) provides an exception for "a person whose presence is shown by a party to be essential to the presentation of the party's cause." The advisory committee notes specify that the exception contemplates "an expert needed to advise counsel in the management of the litigation." Fed.R.Evid. 615(3) advisory committee notes; see Trans World Metals, Inc. v. South Wire Co., 769 F.2d 902, 911 (2d Cir.1985) (expert allowed to remain in the courtroom for the testimony of the adversary's expert); see also Morvant v. Construction Aggregates Corp., 570 F.2d 626, 630 (6th Cir.) ("where a fair showing has been made that the expert witness is in fact required for the management of the case, and this is made clear to the trial court, we believe that the trial court is bound to accept any reasonable, substantiated representation to this effect by counsel"), cert. dismissed, 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978). We review the district court's evidentiary ruling for abuse of discretion. Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 620 (2d Cir.1991) (district court evidentiary rulings reviewed for abuse of discretion); see also Morvant, 570 F.2d at 630 (district court's decision about whether to sequester witness reviewed for abuse of discretion).
 
 
 43
 The district court did not permit Friedell to remain in the courtroom during Redsicker's testimony even though the Maleks' counsel asserted that Friedell's presence was necessary to assist him in preparing to cross examine Redsicker. The district court concluded that counsel could have prepared his cross examination in advance by using Redsicker's reports submitted before the trial but granted a ten-minute recess between the testimony of the two experts to permit the Maleks' expert to confer with counsel.
 
 
 44
 In Trans World Metals, we approved a ruling permitting an expert to remain in the courtroom to hear the testimony of an adversary's expert. In that case, an expert witness was permitted to remain in the courtroom during the direct testimony of the adversary's expert and was later called to rebut the testimony of the adversary's expert. We said:
 
 
 45
 [The expert] may well have been entitled to remain pursuant to the exception in Rule 615(3) for a person whose presence is essential to the presentation of a case.... He was not a fact witness whose recollection might have been colored by accounts of prior witnesses.
 
 
 46
 Id. at 911 (citation omitted). Here, Friedell also was not "a fact witness whose recollection might have been colored" by the testimony of other witnesses; rather, he was an expert whose assistance was important to the presentation of plaintiffs' case and who should have been permitted to remain in the courtroom.
 
 
 47
 Under the circumstances revealed in this case, we find that the district court erred in sequestering Friedell. Our review of the record reveals that Redsicker's testimony differed from his reports: Redsicker testified that the fire was an "intense fire" but did not make that specific finding anywhere in his report. Since this was an important finding bearing on the question of arson and was not made in Redsicker's reports, Friedell's presence in the courtroom was important to the presentation of the Maleks' case, and a ten-minute recess was not an adequate substitute for his presence.
 
 
 48
 C. Impeachment of a Witness Using His Religious Beliefs
 
 
 49
 Fed.R.Evid. 610 provides that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature [his] credibility is impaired or enhanced." Over the Maleks' repeated objections, the district court permitted Schneck to respond to defense counsel's questions about whether his transactions with Malek involved other Hasidim, whether he had other Hasidic clients and whether his teaching position was part of the Yeshiva University system.
 
 
 50
 Because it is apparent from these questions that defense counsel attempted to show that Schneck's character for truthfulness was affected by his religious beliefs and that such questioning may have prejudiced the Maleks, the district court erred in permitting the defendants to pursue this line of questioning. See Contemporary Mission, Inc. v. Bonded Mailings, Inc., 671 F.2d 81, 84 (2d Cir.1982) (affirming district court's refusal to permit questioning of witness' beliefs in the Roman Catholic Church in a breach of contract action because religion was a "collateral, potentially confusing and prejudicial, issue which would perforce have raised a 'religious problem' "). We are particularly troubled about this line of questioning, especially where the impeached witness' religious affiliation is the same as that of the plaintiffs.
 
 D. Harmless Error
 
 51
 Although each of the erroneous evidentiary rulings discussed above, standing alone, may be insufficient to justify reversal, we cannot say that the cumulative effect is harmless. We only will reverse where the improper admission or exclusion of evidence affects "a substantial right" of one of the parties. Fed.R.Evid. 103(a); see 28 U.S.C. § 2111 (1988); Fed.R.Civ.P. 61. Making this determination involves an "assessment of the likelihood that the error affected the outcome of the case." Jordan v. Medley, 711 F.2d 211, 218 (D.C.Cir.1983) (Scalia, J.) (citing United States ex rel. D'Agostino Excavators, Inc. v. Heyward Robinson Co., 430 F.2d 1077, 1083 (2d Cir.1970), cert. denied, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971)). In the words of the Supreme Court: "[I]f one cannot say, with fair assurance ... that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). "Application of this test is highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected ... and the centrality of that issue to the ultimate decision." Jordan, 711 F.2d at 219 (citations omitted); see also Schrand v. Federal Pac. Elec. Co., 851 F.2d 152, 157 (6th Cir.1988); Lataille v. Ponte, 754 F.2d 33, 37 (1st Cir.1985).
 
 
 52
 In New York, an insurance company defending an action brought by its insured to recover the proceeds of an insurance policy must prove the affirmative defenses of arson and fraudulent misrepresentation by clear and convincing evidence. See Long Island Ski Ctr., Inc. v. Hartford Fire Ins. Co., 121 A.D.2d 368, 502 N.Y.S.2d 800, 801 (2d Dep't 1986) (clear and convincing burden of proof for misrepresentation affirmative defense); Hutt v. Lumbermens Mut. Casualty Co., 95 A.D.2d 255, 466 N.Y.S.2d 28, 30 (2d Dep't 1983) (clear and convincing burden of proof for arson affirmative defense). Although any one of the above evidentiary errors standing alone may have been harmless and would not mandate reversal, the cumulative effect of these errors substantially prejudiced the Maleks' case.
 
 
 53
 Much of the evidence produced at trial by the defendants to show the presence of arson and misrepresentation was circumstantial. The evidence excluded by the district court was related to the central issues of this case (motive and opportunity), was not cumulative in nature and did not relate to collateral matters. Given the quality of evidence introduced by the defendants and the heightened burden of proof they faced in proving their affirmative defenses, we cannot say with fair assurance that the jury's verdict was not substantially swayed by the exclusion of the Maleks' evidence. Accordingly, the judgment must be reversed.
 
 CONCLUSION
 
 54
 The judgment of the district court is reversed and the matter is remanded to the district court for further proceedings consistent with this opinion.
 
 McLAUGHLIN, Circuit Judge, dissenting:
 
 55
 My reading of the record differs utterly with the majority's. And on the law I have less than a quarrel, but more than a cavil. More particularly, I disagree with the majority's conclusions that the district judge abused his discretion (1) in excluding evidence from the social worker, (2) in permitting cross-examination of Schneck about his ties to the Hasidic community, and (3) in excluding the Maleks' expert from the courtroom during the testimony of Sea's expert. Reluctantly, I must dissent.
 
 
 56
 1. Barber and the Notes.
 
 
 57
 Carol Barber, the social worker, was called by plaintiffs to give testimony and to usher into evidence certain notes regarding the Agrillos. The majority refers to the notes as "Barber's case notes," implying that Barber herself made the case notes. The majority states that Barber would also have testified about her personal observations. As I read the record, however, Barber was not the author of the notes and had made no personal observations.
 
 
 58
 Nowhere in the record did the Maleks' lawyer allege that Barber had recorded the case notes in question or that she would have testified regarding events that she had personally observed. Rather, the record indicates that the Maleks' counsel issued a subpoena for whatever social worker was responsible for the Agrillos' case at the time of trial, and required that individual to produce all of the Department's records "in connection with residents at" the house the Agrillos leased from the Maleks. Transcript of Trial ("Tr.") at 365.
 
 
 59
 Barber showed up with the records. When the Maleks' counsel, Eugene Farber, sought to question her about the records, Sea's lawyer, Paul Kovner, objected, stating that "[s]he doesn't have any firsthand knowledge of any of this and counsel knows it." Tr. at 366. Judge Gagliardi then examined the records with Barber's help:
 
 
 60
 THE COURT: Sustained. This is all hearsay in any event. Anything in here of any substance that she can testify to?
 
 
 61
 MR. FARBER: I believe your Honor, that the social worker did herself observe some of this and I suggest that it's admissible under 803(6).
 
 
 62
 THE COURT: I don't believe so.
 
 
 63
 MR. FARBER: May I ask one more question, your Honor, and then if your ruling stands I'll move on.
 
 
 64
 THE COURT: Very well.
 
 
 65
 MR. FARBER: Ms. Barber, is there any information that you have personally about cult activity that took place at the premises, specifically involving fire prior to 7/10/9 [sic]?
 
 
 66
 MR. KOVNER: Objection, your Honor.
 
 
 67
 THE COURT: Sustained.
 
 
 68
 MR.FARBER: I'm not asking on the records, your Honor.
 
 
 69
 THE COURT: Sustained.
 
 
 70
 MR. FARBER: Do you have any personal knowledge that the children who lived at the residence were taken from their parents, Ms. Barber?
 
 
 71
 MR. KOVNER: Objection, your Honor.
 
 
 72
 THE COURT: Sustained. I'm going to ask you to remain. You may step down and we'll get to your situation as soon as we can.
 
 
 73
 Tr. at 366-67.
 
 
 74
 This colloquy hardly advanced the inquiry as to who made the notes and as to whether Barber had any first-hand knowledge of the case. I have not overlooked Farber's statement that "the social worker did herself observe some of this." Id. It is clear from the rest of the record, however, that Farber never meant to claim that Barber had made any personal observations, much less recorded any of the case notes.
 
 
 75
 When Sea's counsel objected that Barber "doesn't have any firsthand knowledge of any of this and counsel knows it," Farber did not challenge the characterization in any way. Any residual confusion was later dispelled when Farber raised the issue again:
 
 
 76
 THE COURT: What else do we have with objections and so forth?
 
 
 77
 MR. FARBER: You sustained exclusion of the entire testimony of the social worker.
 
 
 78
 THE COURT: Yes.
 
 
 79
 MR. FARBER: It seems to me, your Honor--
 
 
 80
 THE COURT: She has no personal knowledge of anything as far as I understood.
 
 
 81
 MR. FARBER: I don't think she has to, Judge.
 
 
 82
 THE COURT: She has no personal knowledge.
 
 
 83
 MR. FARBER: I'm aware of that. The person who did is in Pennsylvania retired.
 
 
 84
 Tr. at 422-23 (emphasis added).
 
 
 85
 Thus, Mr. Farber finally and candidly conceded that Ms. Barber did not have personal knowledge as to any part of her "entire testimony," and that the social worker who made the records was in Pennsylvania. Id. The colloquy then continued as follows:
 
 
 86
 MR. FARBER: But under Rule 408 [sic. Presumably he meant 803.], your Honor, I think she can testify based upon records kept in the ordinary course of her business.
 
 
 87
 THE COURT: As to what?
 
 
 88
 MR. FARBER: Any observations made or things told to a social worker who was actually handling the matter at the time or, your Honor, as to observations which she made and some she did.
 
 
 89
 Tr. at 423.
 
 
 90
 In this last colloquy, counsel's artless language fuels the confusion, and demonstrates the perfidy of an unanchored pronoun. The majority may have concluded that the "she" in Farber's final quoted sentence is the same "she" he referred to in his prior statement to the court, viz., Ms. Barber. However, in the context of the other statements made by Farber, it seems to me that the final "she" was not Barber, but rather "a social worker who was actually handling the matter at the time." This seems the only logical reading, given counsel's concession, made just eight lines earlier in the transcript, that Barber had no personal knowledge as to the matters on which she was about to testify. It is impossible to have made observations, and, yet, to have no personal knowledge of them.
 
 
 91
 Accordingly, I reject the majority's conclusion that the Maleks proffered Barber to testify on records that she actually made and to testify to events that she actually observed. In reaching this conclusion, I recognize that Farber was twice precluded from asking questions regarding Barber's personal knowledge. However, as noted above, Farber explicitly conceded to Judge Gagliardi later in the trial that Barber had no personal knowledge of the matters to which she was called to testify. Clearly, the Maleks can show no prejudice from this ruling.
 
 
 92
 Moreover, even if Barber could honestly say that she had personal knowledge of matters occurring at the house before July 10, including cult activity involving fires, or personal knowledge that the children who lived at the house were taken from their parents, such personal knowledge should not be indiscriminately identified with first-hand knowledge. A person may have personal knowledge of a hearsay declaration; but that does not make it admissible. Barber could have gained personal knowledge (and likely did) from a conversation with the former social worker or from conversations with others.
 
 
 93
 I believe that the trial judge was well within his rights to conclude that Barber had no first-hand knowledge of this case. Certainly the lawyer who tendered her as a witness failed to demonstrate that she could give admissible evidence, other than testimony to lay the foundation for the admissibility of the case notes as business records.
 
 
 94
 For sure, Barber, as a social worker, would be competent to shepherd the case notes into evidence under Fed.R.Evid. 803(6). And this remains true, even though she lacked first-hand knowledge of the facts recorded therein. If, as I believe is the case here, her sole contribution to the trial would be to answer the formulaic question of Rule 803(6) (regular course of business to keep records and to make regular entries), the inquiry proceeds to the next step: who made the entries in the record, and did that person have first-hand knowledge?
 
 
 95
 These entries appear to have been made by the retired social worker who had moved to Pennsylvania before trial. To the extent that the retired social worker had first-hand knowledge of the facts, the records would have been admissible. Unfortunately, plaintiffs' counsel chose to leave the trial record clouded in obscurity on this pivotal issue. And, of course, it was his burden to make an offer of proof that would dissipate the fog. See W.W.W. Pharmaceutical Co. v. Gillette Co., 984 F.2d 567, 574, n. 4 (2d Cir.1993) ("an offer of proof [is] required to preserve evidentiary rulings of exclusion for appeal").
 
 
 96
 If the retired social worker lacked first-hand knowledge, then some other exception to the hearsay rule would have to be invoked to forge an admissible chain of hearsay links. See Gray v. Busch Entertainment Corp., 886 F.2d 14, 15 (2d Cir.1989) (statements of daughter of accident victim to amusement park nurse recorded in first-aid report were not admissible because daughter "in talking with the nurse, was not acting in the regular course of business," and the record of her statement did not fall "within some [other] exception to the hearsay rule"); Cook v. Hoppin, 783 F.2d 684, 690 (7th Cir.1986) (in hospital setting, business records exception encompasses declarants who report to a record-keeper as part of their regular business routine, and does not encompass statements by unidentified declarant who brought patient to the hospital); Yates v. Bair Transport, Inc., 249 F.Supp. 681, 684 (S.D.N.Y.1965) ("it must be borne in mind that there are numerous exceptions to the hearsay rule and that an utterance, while not properly admitted under one exception, may very well be admitted under another"); cf. In re Leon RR, 48 N.Y.2d 117, 122, 421 N.Y.S.2d 863, 867, 397 N.E.2d 374, 377 (1979) (To defeat an objection to multiple-level hearsay in a business record, "not only must the entrant be under a business duty to record the event, but the informant must be under a contemporaneous business duty to report the occurrence to the entrant as well."). Thus, to the extent that the reports included statements made to the retired social worker by individuals not under a business duty to make such statements, plaintiffs did not even suggest an adequate basis to defeat the hearsay objection.
 
 
 97
 The photographs appended to the reports (and offered to prove that the Agrillos still occupied the house on July 10th, the date of the fire) are particularly troublesome. Of course, it cannot be contended that extraneous documents that are attached to a business record thereby become a part of the record and automatically admissible as such. See United States v. Rosenstein, 474 F.2d 705, 710 (2d Cir.1973). While the majority has adopted the Maleks' appellate representations that the photographs were "taken ... by Mrs. Agrillo" and "depicted a container of milk that had not yet reached its expiration date," the sum total of Farber's discussion in the trial record on this point was as follows:
 
 
 98
 MR. FARBER: The evidence will show that somebody went either the 5th, 6th, or 7th and took pictures in the place and in the place they found a container of Half 'n Half which was still good.
 
 
 99
 Tr. at 218.
 
 
 100
 Thus, by the terms of the proffer at trial, the evidence that the milk was still fresh came from the representation of an unnamed person and not from the photograph itself. This underscores the wisdom of Judge Gagliardi's decision to exclude it. See Saks Int'l, Inc. v. M/V "Export Champion," 817 F.2d 1011, 1013 (2d Cir.1987) ("The principal precondition to admission of documents as business records pursuant to Fed.R.Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable."); see also Cook, 783 F.2d at 689-90 (declarations of unnamed person who brought plaintiff to hospital properly excluded as not within the business records exception). If, as Farber now claims on appeal (but did not mention to the trial court), the photographs were taken by Mrs. Agrillo, it is clear that neither the photographs themselves nor any representations she may have made regarding them were admissible as business records because she was under no business duty to impart such information. I also note the total lack of authentication of the photographs as required by Rule 901.
 
 
 101
 Focussing solely on the evidence that might properly have been admitted under Rule 803(6)--those parts of the retired social worker's reports based on her first-hand knowledge--I cannot conclude that Judge Gagliardi abused his discretion in excluding even that evidence on relevance grounds. As he succinctly put it, "[t]hese people [referring to the Agrillo family] were out of there, by the testimony in this case, on July 5th,...." Tr. at 423-24. Because the fire occurred on July 10, the trial judge concluded that testimony about the Agrillos' ceremonial use of fire prior to July 5th was irrelevant.
 
 
 102
 The majority argues that the photographs and testimony about them "would have been relevant" because such evidence "would have contradicted the defendants' argument that the Agrillos could not have started the fire because the fire occurred five days after" the eviction. Again adopting a representation made in the Maleks' brief (which the Maleks did not make to the trial judge), the majority finds that the pictures were taken "on July 6 or 7, 1989." The trial record, however, reveals that Farber stated that the photographs were taken on "either the 5th, 6th or 7th" of July. Tr. at 218.
 
 
 103
 Thus, by Farber's own words, the photographs might have been taken on July 5th; and there was no direct evidence proffered that the Agrillos were in the house thereafter. A photograph taken on July 5th depicting continuing residence would prove little because the Agrillos were not evicted until that day. Upon that, everyone agrees. The majority cannot simply accept counsel's representation, made for the first time on appeal, that the photographs were not taken on July 5th. Accordingly, Judge Gagliardi's conclusion that all of Barber's evidence was irrelevant was, in my estimation, eminently reasonable, and certainly no abuse of discretion.
 
 
 104
 2. Cross-Examination About Witness's Religious Belief.
 
 
 105
 I also disagree with the majority's conclusion that the cross-examination of William Schneck violated Fed.R.Evid. 610. The majority states that "it is apparent from these questions that defense counsel attempted to show that Schneck's character for truthfulness was affected by his religious beliefs...." It is not apparent to me, and, in fact, I disagree. Rather, I believe that the questioning represented a completely legitimate attempt to impeach Schneck by showing that his livelihood depended in large part on his relationship with the Hasidic community, a community of which Mr. Malek was a member. As such, it was an attempt to show bias, which does not violate Rule 610, even where, unlike here, the witness is asked about his religious beliefs and opinions. See United States v. Teicher, 987 F.2d 112, 118 (2d Cir.1993) ("The rule proscribes the impeachment of witnesses based upon their religious beliefs. However, inquiry into religious beliefs 'for the purpose of showing interest or bias because of them is not within the prohibition.' ") (citation omitted) (quoting Fed.R.Evid. 610 advisory committee's note).
 
 
 106
 Sea's counsel opened his cross-examination of Schneck by establishing that he first met Mr. Malek during a business transaction. Sea's counsel also brought out that Schneck had been a radio personality on a local Rockland County, New York station. The following exchange occurred:
 
 
 107
 Q. What was the target audience of that station?
 
 
 108
 A. To be honest with you, I don't know. I believe it was a Rockland show.
 
 
 109
 Q. Was it in the Hasidic community?
 
 
 110
 A. Not that I know of. It's a radio station that is supposed to go across the complete county. It possibly carries over Dutchess and Orange, I can't speak for it, though. I'm not a technical person in that respect.
 
 
 111
 Tr. at 389. This exchange was immediately followed by the questioning that appears in the majority's discussion of the religious issue.
 
 
 112
 It is significant that all the areas discussed, a radio show, commercial transactions, work as a CPA, and teaching, involved Schneck's livelihood. At no point was he asked about his opinions or beliefs. Nor, indeed, was he questioned about what religion he followed. He was queried solely about his livelihood, presumably to demonstrate that he earned his living by service to the Hasidic community. Moreover, when defense counsel seemed to stray beyond this perimeter by questioning Schneck regarding whether Touro Law School was "affiliated with organized Jewish institutions," Judge Gagliardi sustained an objection, apparently because the question did not pertain specifically to Schneck's relationship to the Hasidic community. Nobody, in short, suggested that Schneck was less credible because of his belief on matters of religion.
 
 
 113
 Unlike the only case cited in the majority's opinion, Contemporary Mission, Inc. v. Bonded Mailings, Inc., 671 F.2d 81, 84 (2d Cir.1982), the witness here was not subject to "extensive cross-examination ... on the genuineness of his ... [religious] affiliation...." I am aware of no case--and none has been cited--where a Rule 610 violation was found absent direct questions about either the witness's religious beliefs or the witness's opinions on religious beliefs or practices. Cf. United States v. Kalaydjian, 784 F.2d 53, 57 (2d Cir.1986) (affirming district court's decision precluding cross-examination about witness's reasons for not swearing on the Koran before testifying); United States v. Sampol, 636 F.2d 621, 666 (D.C.Cir.1980) (rejecting appellant's arguments that trial court erred in "refus[ing] to permit counsel ... to cross-examine [witness] about his religious beliefs" where, on voir dire, witness had "testified that he faithfully adhered to the teachings of [a] sect and consulted with spirits of his religion before taking certain actions," but "had no religious beliefs which would cause him to violate his oath to testify truthfully"); Government of Virgin Islands v. Petersen, 553 F.2d 324, 326 (3d Cir.1977) (upholding exclusion of testimony from defendant's alibi witness where defense counsel stated that "I would like to get some proof in the record about this [witness]'s beliefs.... about being Rastafarian[ ]").
 
 
 114
 Because I believe that the evidence here was introduced to show bias, and because such a purpose is clearly permissible under Rule 610, I dissent from the majority's conclusion to the contrary. See 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence, p 610 at 610-2 (1991). ("Evidence probative of something other than veracity is not within the prohibition of [Rule 610]. For example, disclosure of affiliation with a church which is a party to the litigation may be admitted as relevant to bias....") (footnote omitted).
 
 
 115
 Finally, I am puzzled that the majority is "particularly troubled about this line of questioning, especially where the impeached witness' religious affiliation is the same as that of plaintiffs." First of all, there is no evidence that Schneck and Maleks are co-religionists. Secondly, Schneck's religion, as noted above, was never even discussed. Thirdly, the only times that Mr. Malek's religion was brought up, it was by his own counsel. In his opening statement, Farber informed the jury that "Mr. Malek, of course, is a Hasidic [sic] Jew. You can see that readily. And wasn't born in this country. Came here, studied--...." Tr. at 44. At this point, Judge Gagliardi interrupted Farber's opening, because the statement was digressing from the relevant facts of the case. Id. Malek was called as the first witness in his own case, and Mr. Farber's first six questions to his client related to Mr. Malek's employment as the executive director of a synagogue. Tr. at 59-60.
 
 
 116
 3. Sequestering the Expert.
 
 
 117
 The majority also faults the trial judge for excluding the plaintiffs' expert (Friedell) from the courtroom during the testimony of Sea's expert (Redsicker). It has been said that the sequestration provision of Rule 615 does not apply to experts. Trans World Metals, Inc. v. Southwire Co., 769 F.2d 902, 911 (2d Cir.1985) (expert permitted to remain because he "was not a fact witness whose recollection might have been colored by accounts of prior witnesses"); Morvant v. Construction Aggregates Corp., 570 F.2d 626, 630 (6th Cir.) ("It is true that an expert witness does not normally testify to his firsthand knowledge of the facts of the particular case and therefore will not be in a position to conform his testimony to that of others even if so inclined."), cert. dismissed, 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978).
 
 
 118
 The difficulty I have with the majority opinion is that I cannot accept its assertion that Friedell "was not 'a fact witness whose recollection might have been colored' by the testimony of other witnesses." The record clearly indicated that Friedell testified extensively to facts arising from his personal examination of the fire scene. Among other things, he testified that:
 
 
 119
 "I found immediately upon entering, and I had seen it before that, that in the south portion of the building where the chimney is, that the roof had completely burned off, that the floor on the first floor had burned and collapse had occurred," Tr. at 404;
 
 
 120
 "inside the building, all sides of all appliances, all parts of the walls were totally blackened and charred," Tr. at 405;
 
 
 121
 "[t]here was no melting of copper in any hollow tubing anywhere," Tr. at 407; and
 
 
 122
 "I saw copper tubing which went from a quarter to three eighths diameter which led originally from the propane tanks which were outside the building into the appliances which were inside. Some of it was cut, some of it was severed. All of the copper tubing which I saw both inside and outside the house was in severely damaged condition. But none of it was melted," Tr. at 407-08.
 
 
 123
 He also testified that he saw no fuses in the house's fuse box, Tr. at 411, and that "[t]here was massive fire damage in that building." Tr. at 414. It strikes me that this factual testimony could easily have been "colored" by Friedell if he had been permitted to hear Redsicker's testimony. Cf. Morvant, 570 F.2d at 630 ("the very breadth of the permissible scope of testimony by an expert witness suggests that in some circumstances at least, the trial judge could be justified in holding that his presence in the courtroom was not essential and that his exclusion from the courtroom might in a given case make a more objective and, perhaps, more honest witness out of him").
 
 
 124
 Because Redsicker also testified extensively to facts regarding the condition of the house, Tr. at 248-72, the trial court's decision to exclude Friedell during Redsicker's testimony was consonant with the basic thrust of Rule 615, which, in a departure from the common law, makes the exclusion of witnesses mandatory in most circumstances. See Government of Virgin Islands v. Edinborough, 625 F.2d 472, 474 (3d Cir.1980) ("The mandatory language of the rule shows that it was intended to change the prior practice under which the trial court had discretion to determine whether a witness should be excluded."). Though a witness should not be excluded under Rule 615 if his presence "is essential to the presentation" of the case, and, had I been the trial judge, I probably would not have excluded Friedell, that hardly ends the inquiry. We may not find error unless the decision to exclude rises to the level of abuse of discretion. I do not believe it does.
 
 
 125
 I respectfully dissent.
 
 
 
 [1]
 Sea inadvertently failed to reject the claim