**PHOENIX ASSOCIATES III, Barry Silverstein, Dennis McGillicuddy, and D. Stevens McVoy, individually and as general partners of Phoenix Associates III, Plaintiffs–Counter–Defendants–Appellants,**

v.

**Martin STONE, Defendant–Counter–Claimant–Appellee.**

**No. 1019, Docket 94–7744.**

United States Court of Appeals, Second Circuit.

Argued March 13, 1995.

Decided July 12, 1995.

David N. Ellenhorn, New York City (Harry Frischer, John J. O'Connell, Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, of counsel), for appellants.

Louis A. Craco, New York City (Eliott M. Berman, Willkie Farr & Gallagher, New York City, James M. Brooks, Brooks & Meyer, Lake Placid, NY, of counsel), for appellee.

Before: MESKILL, CARDAMONE and ALTIMARI, Circuit Judges.

MESKILL, Circuit Judge:

This appeal requires us to review evidentiary rulings in a jury trial involving certain oral business agreements.

Phoenix Associates III and its general partners, Barry Silverstein, Dennis McGillicuddy and Stevens McVoy (Phoenix Associates)[1] appeal from a judgment of the United States District Court for the Northern District of New York, Gagliardi, J., United States District Judge for the Southern District of New York, sitting by designation. Judgment entered following the jury's rejection of appellants' claim that they had an oral contract with defendant-appellee Martin Stone. Appellants contend that the district court erroneously refused to allow into evidence certain documents substantiating their claim. We agree, reverse the judgment below and remand for a new trial.

## BACKGROUND

The jury heard evidence of the following events. Silverstein, McGillicuddy and McVoy began a personal and business relationship with Martin Stone in 1987. Stone joined appellants in various business ventures, occasionally on the basis of oral rather than written agreements. Because many of

---

1. Appellants operated through various partnerships, including the Silverstein Group, Phoenix Associates II and Phoenix Associates III. Appellants are referred to collectively as Phoenix Associates unless otherwise noted.

his assets were real estate holdings, Stone often relied on appellants to advance funds for mutual investments on his behalf, with the understanding that he would reimburse them for his share at a later date. Stone maintained numerous investments of his own, and in August 1987 he sought to interest Silverstein in one such enterprise, California Business News. Stone owned this regional business magazine in its entirety but was running out of funds to pay its ongoing expenses, and he sought appellants' help to support the magazine until it became profitable, whereupon it could be sold at a higher price.

Stone's initial inquiry led to detailed negotiations. Specifically, Stone offered Phoenix Associates fifty percent of the magazine's shares in return for a cash payment of $1.2 million, plus an additional $500,000 for Stone's salary for two years, with each party to provide another $250,000 in funding if needed. Although the parties did not reach an agreement on these terms, Phoenix Associates agreed to make available to California Business News a $400,000 certificate of deposit as security for a loan.

Throughout the period from August 1987 to May 1988 the parties negotiated intermittently, with most discussions occurring between Stone and Robert Ambrosini, appellants' accountant and chief financial officer of many of appellants' ventures. In January 1988, with no agreement having been reached, Phoenix Associates began funding the magazine's monthly budget shortfalls and repaid the $400,000 loan for the magazine. In time, losses of California Business News required an ever-increasing investment, raising the price of Phoenix Associates' expected contribution in the parties' negotiations. Phoenix Associates decided to continue funding the magazine's monthly losses, despite Ambrosini's conclusion in May 1988 that the magazine could not maintain itself in the near future and thus could not soon be sold for a profit.

By the summer of 1988 Phoenix Associates had advanced almost $2.7 million to California Business News. Stone had invested an additional $800,000. Ambrosini and Stone again negotiated in May, June and September 1988, and Ambrosini described the results of these meetings in memoranda regularly sent to Silverstein. Specifically, in a September 25, 1988 memorandum Ambrosini agreed with Stone's assessment that it might require another $1.2 or $1.3 million in subsidies for the magazine to reach profitability. The memorandum set forth Stone's proposal that appellants purchase half of California Business News for $2,871,633, a figure that included their payments to date. Ambrosini also described Stone's opinion that they should continue to fund the magazine until it broke even, and stated that Stone had agreed to share equally with Phoenix Associates any future costs of the magazine once appellants' investment equaled the $2,871,633 base amount. Silverstein agreed to the arrangement after reviewing this memorandum, and Ambrosini allegedly conveyed Silverstein's assent to Stone.

Appellants alleged at trial that this agreement constituted an enforceable oral contract, rendering Stone liable for one-half of all payments made by appellants above the base amount. The agreement, they contended, supported their decision regularly to advance funds to the magazine while the magazine continued to lose money. Appellants assert that throughout the period from October 1988 to March 1990 Stone paid a far smaller amount of the magazine's expenses, and Silverstein, McGillicuddy and McVoy all testified to Stone's assurances that he would reimburse Phoenix Associates for the advances made on his behalf when he could sell some real estate. Phoenix Associates had invested a total of $3,380,665 in the magazine by the end of 1988 and a total of $5,688,665 by the end of 1989.

In March 1990 Stone succeeded in selling some property, and he wired $1.2 million to California Business News on March 20, 1990. The magazine then transferred $950,000 to Phoenix Associates that same day. Appellants contended that this transaction reflected Stone's acknowledgement and partial repayment to Phoenix Associates of his share of the advances previously made on his behalf. Stone, they argued, allegedly had informed Ambrosini that he wanted his repayment routed through California Business

News for tax reasons. Stone, on the other hand, asserted that he sent the money to California Business News for publishing expenses, and that the magazine wired the $950,000 to Phoenix Associates as a partial repayment of appellants' loans. In support of his position Stone offered evidence that the magazine's March 31, 1990 balance sheet denoted his $1.2 million check as an increase of the debt owed by the magazine to Stone, and Phoenix Associates' books similarly declared the $950,000 it received as a repayment from the magazine. A written notation on appellants' record of the wire transfer, however, stated that the $950,000 was a repayment of Stone's debt to Phoenix Associates.

Appellants further alleged at trial that they continued to fund the magazine for both parties until 1991. Phoenix Associates ultimately became unable to pay California Business News' expenses and stopped funding the magazine. The magazine then was liquidated, with its balance sheets showing a total debt to Stone of $6,787,363 and to Phoenix Associates of $6,192,665.

The parties thus agree that Phoenix Associates held an interest in California Business News, based on an oral agreement between the parties, but disagree as to the form that agreement took. The question at trial was whether the agreement involved only an investment by Phoenix Associates in return for either repayment of the amounts loaned or fifty percent of the magazine's shares, as claimed by Stone, or whether, as asserted by appellants, the parties also agreed to share the magazine's ongoing expenses after Phoenix Associates' investment of $2.87 million equalized the parties' ownership interests.

Appellants attempted to introduce several documents into evidence to support their claim. First, appellants offered the record of the March 20, 1990 wire transfer, recording the $950,000 wired from California Business News to Phoenix Associates, which stated that the transfer was a reimbursement for funds advanced by Phoenix Associates on Stone's behalf. Second, appellants sought to introduce a financial work paper that Ambrosini used in preparing appellants' 1989 financial statements, showing that appellants' assets included a receivable from Stone to Phoenix Associates in the amount of $1,796,932. Third, appellants offered four memoranda from Ambrosini to Silverstein, written from May to September 1988, that recorded the terms of the agreement and the debt allegedly owed by Stone. The district court refused to allow the documents into evidence, sustaining Stone's objections on hearsay grounds.

Stone contended at trial[2] that the parties never even discussed the agreement as alleged by appellants, and he relied on the fact that the various unsigned draft agreements prepared by the parties' lawyers throughout the months of sporadic negotiations never included any terms concerning payment of future expenses. Indeed, Stone's counsel continually referred to the absence of any form of written documentation supporting the alleged agreement throughout the trial, and he asserted in his closing argument that appellants' failure to supply any written documentation corroborating the existence of the alleged oral agreement proved that the agreement was merely a recent fabrication. The jury agreed, returning a verdict for Stone. This appeal followed.

### DISCUSSION

■ We will reverse the evidentiary rulings of a district court only if they are manifestly erroneous. *See Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *Proteus Books Ltd. v. Cherry Lane Music Co.,* 873 F.2d 502, 514 (2d Cir.1989). Absent such an abuse of discretion, a trial court's rulings on evidence will be left undisturbed. *See Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1210 (2d Cir.1993); *United States v. Sun Myung Moon,* 718 F.2d 1210, 1232 (2d Cir.1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984).

---

**2.** Prior to trial the district court rejected Stone's argument that appellants' claim was barred by New York's statute of frauds. *See* N.Y.Gen.Obli gations L. § 5–701 (McKinney 1989). This decision is not contested on appeal.

## I. *The Wire Transfer Record*

Appellants first argue that the district court erroneously excluded the record of the March 20, 1990 wire transfer, which contained a notation describing the transfer as a "Reimbursement of Investments made on behalf of Marty Stone." Appellants assert that this record was admissible as a business record.

Federal Rule of Evidence 803(6) provides an exception to the hearsay rule for:

A memorandum, report, record, or data compilation, in any form, of acts [or] events, ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed.R.Evid. 803(6). Rule 803(6) "favor[s] the admission of evidence rather than its exclusion if it has any probative value at all," *In re Ollag Constr. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir.1981) (quotation omitted), and the "principal precondition" to admissibility "is that the record[ ] [has] sufficient indicia of trustworthiness to be considered reliable." *Saks Int'l v. M/V "EXPORT CHAMPION"*, 817 F.2d 1011, 1013 (2d Cir.1987). Further, the proffered record must be supported by a proper foundation, namely, that the document was " 'kept in the course of a regularly conducted business activity' and also that it was the 'regular practice of that business activity to make the [record].' " *United States v. Freidin*, 849 F.2d 716, 719–20 (2d Cir.1988) (quoting Rule 803(6)). This foundation must be established by the " 'testimony of the custodian or other qualified witness' of the record." *Id.* at 720 (quoting Rule 803(6)).

Stone's objection at trial, and the ground on which the district court principally relied in excluding the document, was the lack of a proper foundation. Prior to the offer of the wire transfer record as an exhibit, however, Ambrosini testified that transfer records were completed regularly by Phoenix Associates' accounting department on the receipt or issuance of every wire transfer. The district court, moreover, received considerable evidence that the transfer of large sums was a regular part of the partnership's investment activities. Thus, the exhibit clearly was made "in the course of a regularly conducted business activity," *see* Fed.R.Evid. 803(6), and was not "drafted in response to unusual or 'isolated' events." *United States v. Strother*, 49 F.3d 869, 876 (2d Cir.1995).

The district court also noted that Ambrosini was not qualified to testify as the custodian of the wire transfer record because he worked for both Phoenix Associates, the recording business, as well as California Business News, the transferor. A custodian's source of employment is irrelevant, however, as long as his testimony can supply a sufficient foundation. *See Raphaely Int'l, Inc. v. Waterman Steamship Corp.*, 972 F.2d 498, 503 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1271, 122 L.Ed.2d 666 (1993). As Ambrosini was "sufficiently familiar with the business practice" of Phoenix Associates and as his testimony indicated that the "records were made as part of that practice," *United States v. Rosenstein*, 474 F.2d 705, 710 (2d Cir.1973); *see also* 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 803(6)(b)[04], 803–213 (1994), we conclude that Ambrosini was qualified to testify as custodian.

We further reject Stone's argument that Ambrosini's failure to identify the specific employee responsible for filling out the record proved fatal to its foundation. "The custodian need not have personal knowledge of the actual creation of the document.... Nor is there any requirement under Rule 803(6) that the records be prepared by the party who has custody of the documents and seeks to introduce them into evidence." 4 Weinstein's Evidence, at 803–201–04 (quotation omitted). Rather, all that is required is proof that "it was the business entity's regular practice to get information" from the person who created the document, a fact Ambrosini's testimony established.

*Saks Int'l,* 817 F.2d at 1013. We therefore conclude that the exclusion of the wire transfer record was clearly erroneous.[3]

## II. *The Financial Work Paper*

The district court allowed Stone to introduce into evidence appellants' financial statements for 1989, and appellants argue that Rule 106 and the doctrine of completeness required the court also to admit the work paper relied on by Ambrosini in preparing these documents.

Rule 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Fed.R.Evid. 106. The common-law doctrine of completeness, on which Rule 106 is based, likewise requires that a full document or set of documents be introduced: "[W]hen one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible." *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 172, 109 S.Ct. 439, 451, 102 L.Ed.2d 445 (1988). We have interpreted Rule 106 to require that a document be admitted when it is essential to explain an already admitted document, to place the admitted document in context, "or to avoid misleading the trier of fact." *United States v. Marin,* 669 F.2d 73, 84 (2d Cir.1982); *United States v. Rubin,* 609 F.2d 51, 63 (2d Cir.1979), *aff'd,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). Underlying Rule 106, then, is a principle of fairness requiring the introduction of an entire or related document if necessary for the "fair and impartial understanding of the admitted portion" or document. *Marin,* 669 F.2d at 84 (quotation omitted).

Stone's counsel introduced appellants' 1989 financial statements during his cross-examination of Silverstein. These financial statements listed appellants' interest in Phoenix Associates as approximately $212,000 each. During cross-examinations of both Silverstein and Ambrosini, Stone's counsel elicited that even though appellants claimed Stone owed them approximately $1.7 million as of December 31, 1989, their financial statements did not list this specific obligation as an asset. Appellants sought to introduce the work paper to explain the financial statements, as the work paper detailed a receivable from Stone to appellants in the amount of $1,796,932. Ambrosini took this latter figure into account when computing the aggregate figures listed on appellants' financial statements. Specifically, the work paper explained the value of Silverstein's interest in Phoenix Associates by listing all amounts due and receivable to the partnership in the computation of its total assets to arrive at a net equity value of Phoenix Associates. This net equity value, reduced by the percentage interest in Phoenix Associates owned by the individual partners, was then reflected in each partner's financial statement as the value of his interest in Phoenix Associates. Without the work paper, therefore, it was impossible to determine how the financial statements derived this value.

Since Stone's counsel, not counsel for appellants, introduced the 1989 financial statements into evidence, the adversity requirement of Rule 106 was satisfied here. Moreover, without the work paper the jury could not have reached an "impartial understanding" of appellants' financial statements. *See Marin,* 669 F.2d at 84; *see also Frymire-Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 187 (7th Cir.1993) (finding reversible error under Rule 106 where district court prevented defendant from introducing complete financial records that would have placed their apparent admissions against interest in con-

---

**3.** Stone also contends on appeal that the document could be excluded because the handwriting on one portion of the record differs from that on another, and that another notation that the transfer was "approved" was dated several weeks after the transfer itself. Stone did not raise these issues at trial, which are more properly issues to be raised before the district court on remand. *Cf. Fagiola v. National Gypsum Co. AC & S.,* 906 F.2d 53, 59 (2d Cir.1990) (noting requirement that adverse party must specify proper grounds for exclusion of document at trial).

text). Accordingly, Rule 106 required the admittance of the work paper.

 Stone raises two additional arguments on appeal that merit brief mention. First, Stone argues that Rule 106 does not apply because appellants never attempted to move the work paper into evidence at the time the financial statements were admitted, but waited until their direct examination of Ambrosini to do so. While the wording of Rule 106 appears to require the adverse party to proffer the associated document or portion contemporaneously with the introduction of the primary document, we have not applied this requirement rigidly. *See, e.g., Rubin,* 609 F.2d at 63 (upholding admission of notes under Rule 106 even though government waited until its redirect examination of witness to introduce them). Thus, the timing of appellants' proffer fell within the requirements of Rule 106. Second, Stone argues that even if Rule 106 applies, the work paper constituted inadmissible hearsay. Rule 106 "does not compel admission of otherwise inadmissible hearsay evidence," *United States Football League v. National Football League,* 842 F.2d 1335, 1375–76 (2d Cir. 1988), and documents generally are admitted under the Rule for the same purpose as the primary documents they explain. *See United States v. Pierre,* 781 F.2d 329, 332 n. 2 (2d Cir.1986). Because Ambrosini testified that he prepared the work paper each year in the regular course of preparing appellants' financial statements, and it was the regular practice of appellants' business to make such documents, the work paper was admissible as a business record. *See* Fed.R.Evid. 803(6); *see also Freidin,* 849 F.2d at 722–23. Further, because Stone's counsel offered appellants' financial statements to establish that appellants themselves did not list a debt owed them by Stone among their assets, the work paper likewise should have been admitted for substantive purposes under Rule 106.

### III. *The Ambrosini Memoranda*

Finally, appellants contest the exclusion of four memoranda written by Ambrosini to Silverstein concerning the California Business News negotiations. The district court sustained objections to each of the documents on the ground that Stone had not seen them when they were written, despite appellants' argument that the memoranda were prior statements that were consistent with Ambrosini's trial testimony.

Rule 801(d)(1)(B) provides that a prior statement is not hearsay where "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is … consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed.R.Evid. 801(d)(1)(B). Appellants assert that Stone consistently argued to the jury that the oral agreement claimed by appellants was a recent fabrication. Therefore, appellants contend, the Ambrosini memoranda should have been admitted because they were consistent with his trial testimony, thus refuting the claim of recent fabrication.

 Our cases distinguish two permissible uses of prior consistent statements. First, prior consistent statements can be introduced to rehabilitate the credibility of a witness who has been impeached by a prior inconsistent statement. *See, e.g., United States v. Khan,* 821 F.2d 90, 94 (2d Cir.1987); *Pierre,* 781 F.2d at 333. Where a prior consistent statement is offered for substantive purposes, however, as the Ambrosini memoranda were offered below, a proponent must establish three elements under Rule 801(d)(1)(B): (1) "that the prior consistent statement is consistent with the witness's in-court testimony;" (2) that the prior consistent statement is being "offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive;" and (3) that "the prior consistent statement was made prior to the time that the supposed motive to falsify arose." *United States v. Quinto,* 582 F.2d 224, 234 (2d Cir.1978) (quotations and original alterations omitted); *see Tome v. United States,* —— U.S. ——, 115 S.Ct. 696, 701, 130 L.Ed.2d 574 (1995) ("A consistent statement that predates the motive [to fabricate] is a square rebuttal of the charge that the testimony was contrived as a consequence of that motive.").

The four proffered memoranda detailed the proposals and counter-proposals exchanged by Ambrosini and Stone during their negotiations, and Ambrosini prepared each memorandum shortly after the parties' discussions. Two of these documents, both dated May 5, 1988, stated that once Phoenix Associates and Stone agreed to a base amount, any additional funds needed by the magazine would be shared by the parties in "pari pasu [sic]." A third memorandum, dated June 28, 1988, outlined the cash contributed by the parties as of the end of that month, and specified an "amount over base level—pari passu" owed by Stone to Phoenix Associates. Finally, Ambrosini's September 25, 1988 memorandum again detailed the amounts of the parties' contributions to date, outlined Stone's proposal for the base amount required for Phoenix Associates to acquire fifty percent of California Business News, and further stated that "[f]or magazine expenses above [the base] amount you would go 50/50 with Martin [Stone]." Ambrosini testified that Silverstein reviewed this last memorandum and approved the terms, and that he conveyed Silverstein's consent to Stone. Because Ambrosini testified in detail to the substance of these negotiations, the four proffered memoranda were consistent with his trial testimony.

The memoranda thus supported the existence of the oral agreement Ambrosini claimed he negotiated with Stone, and they were offered to rebut a charge that Ambrosini fabricated that agreement. Stone's counsel made this charge in his opening argument:

> And the evidence will further establish that there came a time in early 1991 when, *for the first time*, the Silverstein group contended to Mr. Stone, you owe us half of the money that we have been investing, and it amounted to over a million dollars. Mr. Stone immediately disputed that. There were some other meetings that you will hear about, and then we got into this lawsuit.

(emphasis added). Stone's counsel repeated this theme that appellants recently fabricated the agreement throughout his examination of Silverstein, immediately before Ambrosini took the stand, as well as through his extensive use of documents which, he contended, did not contain any reference to the oral agreement claimed by appellants. Indeed, the charge of recent fabrication permeated Stone's case. A charge of recent fabrication can be either express or implied for Rule 801(d)(1)(B) to apply, *see Khan*, 821 F.2d at 94, and the prior statement can relate to a central theme of an adversary's case, *see United States v. Reed*, 887 F.2d 1398, 1406 (11th Cir.1989) (finding charge of recent fabrication began in opponent's opening argument and continued through his cross-examination of government's chief witness, justifying introduction of prior consistent statement under Rule 801(d)(1)(B)), *cert. denied*, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990). Further, contrary to appellee's contention, the Rule does not require appellants to point to a specific inconsistent statement by Ambrosini for the four memoranda to be admissible. *See Khan*, 821 F.2d at 94; *United States v. Brennan*, 798 F.2d 581, 589 (2d Cir.1986), *cert. denied*, 490 U.S. 1022, 109 S.Ct. 1750, 104 L.Ed.2d 187 (1989).

Finally, it is uncontested that Silverstein drafted the four memoranda contemporaneously with the negotiations with Stone, while the prospects for California Business News' success remained high. Stone's position, however, was that appellants created the claim of the pre-existing oral contract only after incurring the loss of their investment through the collapse of the magazine, and this theme was stressed throughout his cross-examinations and arguments. Ambrosini had no motive to falsify at the time he prepared the excluded documents: such a motive to falsify would only arise when California Business News failed, and all of the contested documents were prepared prior to that time. Accordingly, we find that the district court abused its discretion in excluding the Ambrosini memoranda. *See Quinto*, 582 F.2d at 234.

## IV. *Harmless Error*

Erroneous evidentiary rulings alone do not lead to automatic reversal. We will reverse only where the improper admission or exclusion of evidence affects "a sub-

stantial right" of one of the parties. Fed. R.Evid. 103(a); *see* 28 U.S.C. § 2111; Fed. R.Civ.P. 61. Making this determination involves an "assessment of the likelihood that the error affected the outcome of the case." *Malek v. Federal Ins. Co.,* 994 F.2d 49, 55 (2d Cir.1993) (quotation omitted). "[I]f one cannot say, with fair assurance, ... that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). While each of the three erroneous evidentiary rulings discussed above, if considered alone, may be insufficient to justify reversal, we conclude that the cumulative effect of these exclusions was not harmless.

Stone's counsel maintained throughout trial that oral agreements require corroboration, and he argued that appellants' failure to provide "any written documentation of a secondary nature" meant that they could not corroborate the alleged agreement. For example, Stone's counsel stated in his closing argument:

> You have seen the piles of papers that have become part of the evidence here.... Yet, ladies and gentlemen, out of this entire four-day trial, you have heard by witnesses and you will see by these exhibits, that there is not one piece of paper that supports in a clear, concise, open statement the claim of the plaintiffs—not one.

He further stated:

> You can come in with your oral statements and if you believe the oral statements, fine. But here we have three people saying oral agreements and one person saying, I never agreed to such. So what do I have to do? I have to try to find things that would corroborate whether there was or there wasn't [an agreement].... *No one is here to give us any written documentation of a*

*secondary nature of the existence of any agreement.*

(emphasis added).

Given this attack on appellants' case, it cannot be said that the exclusion of the challenged documents was harmless. Ambrosini's four contemporaneous memoranda to Silverstein provided evidence that the parties did consider the ongoing expenses of California Business News in their negotiations, and possibly arrived at an agreement as to how such expenses should be paid for. Further, the work paper to the 1989 financial statements demonstrated that appellants considered and tabulated Stone's debt to Phoenix Associates, and the amount of this debt was consistent with appellants' calculations as to the amount of expenses advanced by appellants on Stone's behalf. Additionally, the wire transfer record appeared to substantiate this debt as the record reflected the transfer as its partial payment.

 Stone argues that any error was harmless because the excluded documents were cumulative of testimony.[4] *See Taylor v. Curry,* 708 F.2d 886, 891–92 (2d Cir.) (exclusion of draft separation agreement, though in error, was harmless where testimony was given concerning its contents and significance), *cert. denied,* 464 U.S. 1000, 104 S.Ct. 503, 78 L.Ed.2d 694 (1983). In determining whether an error was harmless, however, we must look "to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected ... and the centrality of that issue to the ultimate decision." *Malek,* 994 F.2d at 55 (quotation omitted, alteration in original). Because Stone placed particular emphasis on the need to corroborate the alleged oral agreement with written documentation, it is substantially likely that the complete absence of such documentation af-

---

**4.** Stone also argues that even were we to find that one or more of the excluded documents was not inadmissible hearsay, their exclusion was still proper because the probative value of such evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay." Fed.R.Evid. 403. A decision under this Rule will not be overturned absent an abuse

of discretion. *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1193 (2d Cir.), *cert. denied,* 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). This argument is unavailing, however, as Stone never invoked Rule 403 at trial and the district court made no findings under that Rule. In any event the excluded documents were highly relevant and were not unfairly prejudicial or misleading.

fected the outcome of the case. We therefore find that the district court's erroneous exclusion of the proffered evidence was not harmless.

## CONCLUSION

For the reasons stated above, the judgment of the district court is reversed and the matter is remanded for a new trial.