Weldon L. **RICKETTS**, Plaintiff–Appellant,

v.

**CITY OF HARTFORD; Bernard Sullivan; Sal Gallo; Rob Davis; John DeMaio; Frank Sanzo; Armand Lupo; Matthew Rivera; Paul Cherniack; Mark Pawlina; Michael Fallon and Thomas Donovan, Defendants–Appellees,**

Hartford Police Department; Hartford Police Union; James Quigley; Gary Dumas; Anna Smith; Robert Scaglia and Jack Leitao, Defendants.

No. 443, Docket 94–7422.

United States Court of Appeals, Second Circuit.

Argued Oct. 31, 1994.

Decided Jan. 17, 1996.

As Amended on Limited Grant of Rehearing; Rehearing Otherwise Denied Feb. 14, 1996.

Hope C. Seeley, Hartford, Connecticut (Hubert J. Santos, Santos, Peck & Smith, P.C., Hartford, Connecticut, of counsel), for Plaintiff–Appellant.

James J. Szerejko, Hartford, Connecticut (Michael J. Gustafson, Terrence M. O'Neill, Halloran & Sage, Hartford, Connecticut, of counsel), for Defendants–Appellees.

Before: WINTER, MAHONEY, and GODBOLD,* Circuit Judges.

MAHONEY, Circuit Judge:

Plaintiff-appellant Weldon L. Ricketts appeals from a judgment entered October 15, 1993 in the United States District Court for the District of Connecticut, Alfred V. Covello, *Judge*, that dismissed Ricketts' complaint charging numerous deprivations of his constitutional rights in violation of 42 U.S.C. § 1983, and from an order entered April 6, 1994 that denied Ricketts' motion for a new trial. The judgment was entered following a jury trial that resulted in a verdict in favor of defendants-appellees Sal Gallo, Rob Davis, John DeMaio, Frank Sanzo, Armand Lupo, Matthew Rivera, Paul Cherniack, Mark Pawlina, Michael Fallon, and Thomas Donovan.[1] Ricketts alleged in his third amended complaint that the individual defendants-appellees (other than Sullivan), all Hartford police officers, used excessive force against him and arrested him without probable cause to believe that he had committed a crime because he criticized the police while they needlessly beat a suspect whom they had just pursued and apprehended in the course of arresting that suspect.

On appeal, Ricketts claims that a flaw in the computer program that was used in connection with jury selection caused the venire from which his jury was chosen to be comprised almost entirely of white jurors in violation of the equal protection component of the Due Process Clause of the Fifth Amendment. He also challenges the district court's decision to exclude various items of evidence and to preclude corresponding lines of examination of witnesses.

We affirm.

## Background

### A. *Factual Background.*

On August 12, 1987, numerous police officers (nearly all white, except for one Hispanic and one black) were engaged in a lengthy chase of Timothy Moore, a black man suspected of an assault and attempted robbery, through the streets of Hartford, Connecticut. The chase passed through a soccer field,

---

* The Honorable John C. Godbold of the Eleventh Circuit Court of Appeals, sitting by designation.

1. Prior to trial, the district court granted summary judgment in favor of defendants James Quigley and Gary Dumas, officers of the Hartford Police Union (the "HPU"). *See Ricketts v. City of Hartford*, Civil No. 2:87CV917 (AVC), slip op. (D.Conn. Apr.·5, 1993) (*"Ricketts I "*). The court's ruling did not explicitly recite judgment in favor of the HPU, but the HPU was not named as a party when Ricketts subsequently filed his third amended complaint on the eve of trial. The Hartford Police Department is listed as a defendant in the caption of this appeal, but was never named as a party or listed in the caption of any of Ricketts' complaints, and presumably would not be an appropriate defendant independently of the City of Hartford in any event. The claims against defendants-appellees the City of Hartford (the "City") and Bernard Sullivan, its chief of police, pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), were bifurcated for a separate trial. In view of the jury verdict in favor of the other defendants-appellees, and the derivative nature of any liability that might be imposed against the City and Sullivan, judgment was entered for the City and Sullivan together with the other defendants-appellees. During trial, Ricketts withdrew his claims against defendants Anna Smith, Robert Scaglia, and Jack Leitao. As a result of all the foregoing, the issues presented on this appeal relate only to defendants-appellees.

where Ricketts, also black, coached a soccer team of black youths. Just after passing through the soccer field, the police caught up with Moore and attempted to subdue him. After a series of events, described entirely differently by each side to this litigation, both Moore and Ricketts were arrested. We summarize the testimony concerning these events and their aftermath.

Ricketts testified and produced an additional thirteen eye-witnesses, including youths and adults who were assembled on the soccer field and residents of a nearby housing complex. With respect to the chase, one witness testified that one police car sped directly towards Moore and nearly hit him; this was characterized by another witness as an attempt by two police cars to run Moore over, and by others as an attempt to head Moore off. One officer on foot attempted unsuccessfully to trip Moore by throwing his nightstick. There was testimony that the crowd that had gathered laughed at the officers' failed attempts to catch Moore.

Finally, Moore tripped, collapsed or was brought down by an officer, and several police officers converged upon him, handcuffed him, and began beating him by punching him, kicking him, and hitting him with their nightsticks. The witnesses presented divergent accounts of the number of officers involved. One witness testified that between ten and twelve officers beat Moore, and others recalled at least six or seven, while most testified that three to five officers participated in the beating, but that other officers watched, having formed a semicircle around Moore. There was also varying testimony that the beating lasted nearly five minutes, over three minutes, and about one minute. Prior to the time that Ricketts became involved, another bystander attempted to intervene, but an officer threatened him with arrest and pushed him back from the altercation.

The testimony continued that Ricketts, who claimed that he believed that the officers were trying to kill Moore, moved towards the officers and asked them why they were beating Moore. Some witnesses, including Ricketts himself, described Ricketts as approaching the officers calmly, while others testified

that he did so quickly, shouting angrily "this is not right" and "why are they doing this." One witness testified that as Ricketts approached the police, others in the crowd moved in as well.

Either just as Ricketts arrived, or after an exchange with the officers, or after Ricketts was told or threatened repeatedly not to interfere with Moore's arrest, several officers turned upon Ricketts and wrestled him to the ground. While most of the witnesses testified that the officers beat Ricketts just as they were beating Moore (punching and kicking him, and hitting him with their nightsticks), one witness testified that Ricketts flailed his arms and kicked his legs in an effort to escape, and another suggested that the beating was less severe than Moore's and responded to Ricketts' struggling. In addition, one witness testified that the same officers who beat Moore were the ones who beat Ricketts, while others stated that perhaps one, two, or three of those officers were joined by other officers. Similarly, one witness testified that the officers beat Ricketts for about three minutes, while another stated that the officers beat him for two minutes, another for one minute, and yet another for twenty-five to thirty seconds while Ricketts struggled and resisted arrest.

Witnesses also related that while Ricketts was being beaten, several officers crossed the street to the soccer field and verbally abused the onlooking crowd. Cherniack allegedly said "[y]ou people are such animals," and another officer allegedly called one of the onlookers a "black nigger bastard." In addition, some of the witnesses testified that after Moore and Ricketts had been taken away, several officers performed "high-fives," that is, they slapped their palms against one another's.

Ricketts claimed that when he approached the officers and asked them why they were beating Moore, one officer, Davis, grabbed Ricketts across his neck from behind with a baton, preventing him from breathing. Five or six others, including Fallon, Donovan, Pawlina, and Cherniack, grabbed Ricketts' arms and legs, throwing him to the ground, and kicked him and beat him with their nightsticks and fists. Ricketts testified that

during this melee, he was able to note the badge numbers of all of the officers involved. He also testified that he was dazed or lost consciousness after the beating, and was "dragged" to a police car. A witness testified, however, that Ricketts remained conscious and continued to struggle throughout the incident. On the other hand, several witnesses confirmed that Ricketts was dragged from the scene of the altercation.

Ricketts was then brought in a police car to Mount Sinai Hospital in Hartford, where he was taken into the hospital on a stretcher to which he was handcuffed. Ricketts saw Davis, Cherniack, and Pawlina at the hospital. Davis asked Ricketts for identification, which Ricketts did not have (it was in a bag back at the soccer field). Davis then ripped the pockets off Ricketts' sweatpants. Another officer, probably Pawlina, told Ricketts that he was "[t]here to clean rats out of the gutter" and that Ricketts was one of the rats. Ricketts saw the officers gathered in a group planning how to describe the incident and laughing. After Ricketts was released from the hospital and into police custody, he filed a citizen's complaint against the officers. Ricketts was charged with assault, breach of the peace, and inciting to riot, but the charges were ultimately dismissed.

Not surprisingly, the police witnesses offered a different version of these events. Rivera, who had met with a woman who had been assaulted in an apparent attempt to rob her, proceeded to the vicinity of the assault and there observed Moore, an individual who matched the victim's description of her assailant. Rivera contacted Donovan and Davis, who were assigned to that area, by radio. Moore, the suspect, then saw Rivera and fled as Rivera approached him. Rivera requested assistance and began to follow Moore, first by car and then by foot. Rivera was joined in the foot chase by Nelson, a black police officer involved in the chase but not named as a defendant, Donovan, and Davis. Eventually, the chase led through the soccer field, where a crowd that had gathered cheered Moore on. Officers called out to the crowd to stop Moore, but no one did. Rather, the crowd obstructed the officers who were pursuing Moore.

Other officers in cruisers arrived. The tape recording of the officers' radio transmissions reveals that someone said: "Run him over." Ricketts contends that the voice belonged to Davis (the tape also reveals that the police dispatcher said "[d]on't give up, Rob," which is Davis' nickname), but Davis denied saying this, or even hearing it at the time of the chase. Davis and other officers have listened to the tape, but cannot identify the voice, although they have identified Davis' voice as being on the tape generally. At one point, a cruiser driven by Michelle Lostimillo of the Bloomfield Police Department came close to Moore in an effort to cut him off. Sanzo, who was driving a cruiser, also attempted to cut Moore off.

Lupo and two or three other officers finally brought Moore down, and a struggle ensued. Lupo denied hitting Moore, but Davis admitted doing so, although he had failed to mention this fact in the incident report that he later prepared. A hostile crowd of about thirty to fifty bystanders besieged the officers, running in close and shouting profanities. Eight to ten of the bystanders physically interfered with the officers' apprehension of Moore by striking or slapping them in the back. Most of the officers at the scene were engaged in crowd control in an effort to keep the crowd from swarming the police, but they did not yell racial comments at the crowd.

Lupo testified that one of the bystanders jumped him from behind, pulling him by his shoulders. Lupo freed himself and resumed his attempt to handcuff Moore. Lupo later learned from Davis that the person who had jumped him was Ricketts. When Gallo arrived at the scene, Moore was already down and struggling with Lupo to prevent anyone from handcuffing him. Gallo bent down to help, and while he was attempting to handcuff Moore, he felt someone tugging at his shirt, but he did not see that person or see Ricketts at all during the entire incident. Gallo also testified that he and Lupo were the only officers who struggled with Moore, and that neither of them hit him. Moreover, Gallo testified that he did not have his baton with him, because it had fallen when he dove for Moore earlier in the chase. Lupo and

Gallo testified that once Moore was on the ground, the officers got control of him within thirty to sixty seconds.

Davis saw Ricketts attack Gallo from behind while Gallo attempted to handcuff Moore. Davis grabbed Ricketts from behind and was knocked to the ground in a struggle with Ricketts, who was swinging his arms. Davis struck Ricketts with his fists two or three times, as he attempted to handcuff him, but Davis denied having his nightstick with him at the time. He also testified that no other officers struck Ricketts or hit him with a nightstick. Davis recalled that Pawlina helped him to handcuff Ricketts. The struggle with Ricketts lasted less than thirty seconds.

Cherniack described the struggle as a fistfight between Davis and Ricketts. By the time he reached the fight, Davis was underneath Ricketts; Cherniack and Pawlina, who had also arrived at the scene and noticed the struggle, attempted to grab Ricketts' hands. At one point, Ricketts seized Cherniack's night stick, but Cherniack recovered it. Also, both Cherniack and Pawlina testified that Ricketts bit Pawlina. Cherniack described Ricketts as strong, wiry, and muscular. Eventually, the officers were able to handcuff Ricketts. Neither Pawlina nor Cherniack hit Ricketts, and both testified that Ricketts never lost consciousness. Although Cherniack testified that he had seen Davis punch Ricketts during the fight, Cherniack had stated in answer to a question posed as part of an internal investigation that he had not seen anyone strike Ricketts. Cherniack attempted to reconcile this discrepancy by pointing out that he had asserted in the investigation that reasonable force had been used to subdue Ricketts.

Lostimillo testified that she first noticed the struggle when she saw Ricketts swinging one arm already handcuffed, with the other end of the handcuff loose. She grabbed the arm until the other officers had Ricketts under control. She also testified that she observed Ricketts trying to bite the officers who were subduing him, although she had never mentioned this fact in her report of the incident or during an internal investigation interview. The hospital record pertaining to the bite inflicted upon Pawlina was introduced into evidence.

Donovan and Nelson arrived toward the end of the struggle, and Donovan helped Davis bring Ricketts to a police car. Nelson turned his attention to the crowd, which he described as belligerent towards the officers and yelling profanities at the officers. Because he was from the same neighborhood, he hoped that his presence would calm the crowd.

Once subdued, Ricketts was placed in DeMaio's car; DeMaio had arrived at the scene just as the officers were able to handcuff Ricketts. Ricketts asked to be taken to the hospital. When he got out of the car at the hospital, he fell to the ground. DeMaio testified that the fall appeared to be staged, but he had not mentioned this impression in his incident report or at his deposition. Ricketts was placed on a stretcher. Nelson arrived at the hospital at the same time for treatment of an injury he had developed during the chase, and he agreed that the fall looked staged, but he similarly had not written this in his report for an internal investigation.

Several other officers also accompanied Ricketts to the hospital. When Davis attempted to search for Ricketts' wallet in order to identify him, Ricketts struggled violently and swung his one free hand (the other hand was cuffed to the hospital bed). As a result, Ricketts' pants pocket was ripped. Cherniack did not witness Davis rip Ricketts' pants, but agreed that Ricketts struggled aggressively while at the hospital. He also testified that he never heard Davis or anyone say anything to Ricketts about cleaning up rats or anything else threatening or demeaning. Pawlina also denied making racial remarks, and testified that Ricketts struggled and used profanity while at the hospital.

Fallon, who had arrived at the scene as Moore was being taken away, observed blood on Moore's face. Fallon did not state this fact when he answered written questions presented to him in the course of an internal investigation of the incident, however, and he testified that he prepared his answers during a meeting between the officers and the HPU's lawyers. Other officers also testified

to preparing their reports after discussing the incident among themselves. For example, although Gallo did not see Ricketts at any time, his incident report describes the struggle with Ricketts in detail; Gallo explained that he was merely presenting a composite of what other officers had told him, as is the customary practice, particularly in a chaotic situation. Cherniack similarly testified to filling out his incident report with facts ascertained by talking to other officers, and stated that he had spoken about the incident with virtually every officer involved.

Davis testified that Ricketts did not appear to be injured, and that he could walk and talk "very well." Ricketts testified that he had complained at the hospital about pain in his right shoulder, head, back and left knee, and had been given some pain killers and a sling. In addition, Ricketts' arrest photograph was admitted in evidence, and shows no facial or head injuries.

Ricketts testified, however, that he had suffered serious pain then and subsequently. Over several years after the incident, he saw several doctors, required surgery to his knee twice and his shoulder once, suffered constant pain, and lost much of his physical capabilities that he utilized at work and when coaching soccer. He claims that he did not have problems with his knee or shoulder before his encounter with the police. Dr. Kellerman, whom Ricketts saw shortly after the incident, confirmed that the back of Ricketts' head was swollen, his right shoulder was bruised and had a decreased range of motion, and the left side of his back, his knees, and his ankles were tender. The doctor also testified that Ricketts complained of pain over several years, and Dr. Kellerman referred him for various types of physical therapy and to an orthopedist, although Ricketts had already seen two other orthopedists.

Dr. Mara, the orthopedist to whom Dr. Kellerman referred Ricketts, testified that Ricketts' right collarbone might have been fractured, and that Ricketts had complained about substantial pain in his right shoulder, left knee, and lower back. Dr. Mara ultimately performed surgery upon the shoulder, concluded that the injury was consistent with a beating, and determined that Ricketts had suffered a five-percent impairment to his range of motion. Dr. Mara also examined and eventually performed surgery upon Ricketts' left knee, even though another orthopedist had performed surgery on the knee in the immediate past. Dr. Mara found evidence of the removal of cartilage from the knee as a result of the prior surgery, a torn ligament, and a large free fragment of bone and cartilage, all of which were consistent with a beating, and which resulted in a five-percent impairment in the knee's range of motion.

The defense suggested during the cross-examination of Ricketts, however, that his injuries were so insignificant that a physician's assistant at the hospital, rather than a doctor, had examined him, and that the hospital attendant from whom Ricketts requested a sling had expressed surprise. In addition, the defense elicited from Dr. Kellerman that he had referred Ricketts to Dr. Mara because Ricketts had been dissatisfied with one of the other orthopedists whom Ricketts had seen. The defense suggested that Ricketts had been dissatisfied with both of the previously consulted orthopedists because their diagnoses were not helpful to Ricketts' case. For example, one told Ricketts that he could return to work within three weeks.

Moreover, as Ricketts conceded on cross-examination, the two orthopedists found that Ricketts had suffered from degenerative arthritis prior to his encounter with the police officers. Ricketts never told Kellerman, his primary physician, about these findings. While Dr. Mara disputed that Ricketts suffered from a sufficiently advanced stage of arthritis so as to cause his knee pain, he conceded that the possible fracture to Ricketts' collarbone most likely existed prior to Ricketts' encounter with the police and had been caused by arthritis. And while Dr. Mara testified that he found the shoulder to be separated or dislocated, he understood that the physician who treated Ricketts shortly after the incident with the police had not arrived at the same conclusion, based upon x-rays of the shoulder. On the other hand, Dr. Kellerman testified that Ricketts' head injuries were consistent with being hit by a nightstick, and that minor arthritis can

be asymptomatic until a trauma aggravates the condition.

### B. *Procedural Background.*

#### 1. *The Jury Venire.*

After jury selection, but prior to the commencement of his case-in-chief, Ricketts moved to strike the jury panel on the ground that the manner in which the venire had been drawn violated Ricketts' right to equal protection. Ricketts' jury was drawn from the same venire as was the jury in *United States v. Jackman,* 46 F.3d 1240 (2d Cir.1995), a criminal case over which Judge Covello presided. In that case, the district court conducted a hearing and made findings on which Ricketts relied. We described the procedures relating to the selection of the venire in detail in *Jackman,* 46 F.3d at 1242–44, familiarity with which is assumed, and summarize only the most pertinent facts here.

When this case was ready for trial in the Hartford Division of the United States District Court for the District of Connecticut in September 1992, a computer error had for some time caused Hartford and New Britain residents, whose populations include a substantial majority of the minority residents who are called for jury service in Hartford, to be excluded from jury service in that court. Apparently, the code indicating that a resident is deceased was entered into the computer for all Hartford residents; there is no available explanation for the exclusion of New Britain residents. Yale University, which was under contract to run the program and supply the names of candidates to the jury administrator, was responsible for this erroneous programming.

On August 26, 1992, Judge T.F. Gilroy Daly ruled in another criminal case that this " 'systematic exclusion' " of blacks and Hispanics violated the defendant's right to a jury venire reflecting a fair cross section of the community. *United States v. Osorio,* 801 F.Supp. 966, 979 (D.Conn.1992) (quoting *Duren v. Missouri,* 439 U.S. 357, 366, 99 S.Ct. 664, 669–70, 58 L.Ed.2d 579 (1979)). In response to that decision, the jury administrator of the Hartford Division arranged with the General Services Administration to sup-

ply the computerized list of jurors in place of Yale University. During the transition period, Yale supplied the administrator with a revised list that included residents of Hartford and New Britain. The administrator used this list to supplement the flawed list, however, rather than to replace it.

Accordingly, while the number of minorities appearing for jury service increased, minority representation remained disproportionately low. *See Jackman,* 46 F.3d at 1243–44. Indeed, the venire from which Jackman's and Ricketts' juries were selected was comprised of sixty-two people from the flawed, pre-*Osorio* list and twelve people from the corrected, post-*Osorio* list. Moreover, of the entire venire, only two members resided in Hartford and only four resided in New Britain. Two other Hartford residents failed to respond to their jury summonses. No member of the venire was black. *See Jackman,* 46 F.3d at 1244.

The district court denied Ricketts' application at the outset of the trial to empanel a new jury, and adhered to that ruling when Ricketts raised the issue in a posttrial motion for a new trial. *Ricketts v. City of Hartford,* Civ. No. 2:87CV0917 (AVC), slip op. (D.Conn. Apr. 5, 1994) (*"Ricketts II"*). The court stated that "[t]he evidence at the hearing [conducted in *Jackman, see infra* ] clearly established that this state of affairs resulted from oversight and inadvertence," *Ricketts II,* slip op. at 7, and therefore ruled that Ricketts had not established a Fifth Amendment violation. *Id.* at 7–8.

#### 2. *The District Court's Evidentiary Rulings.*

After Davis testified, Ricketts sought to introduce the tape recording of the police officers and police dispatcher that contains the statement (apparently referring to Moore): "Run him over." Ricketts claims that Davis made this statement, and shortly thereafter became the chief aggressor against Ricketts. After listening to the tape in camera, the district court excluded it from evidence, ruling that Ricketts had failed to authenticate that Davis was the unidentified officer. Ricketts challenged that ruling in his motion for a new trial. The district court

adhered to its initial ruling, but also noted that the tape would have been properly excluded as irrelevant to the question whether the police used excessive force against Ricketts. *See Ricketts II*, slip op. at 3–5.

Ricketts also sought unsuccessfully to introduce various evidence concerning alleged police brutality against other participants in the melee. Ricketts tried to introduce several defendants' written responses to questions asked by the police department's Internal Affairs Division ("IAD") in connection with its investigation of the encounter. Each officer was required to answer five questions relating to whether he had observed any officer(s) strike or kick Moore, Ricketts, or Garnett Williams, a witness at trial and former plaintiff in this action who also claimed to have been beaten by the officers (Williams settled his claims).[2] The district court precluded Ricketts from introducing the officers' responses to the IAD questions insofar as they related to Moore and Williams, but permitted the introduction of the responses that related to Ricketts.

In addition, the court precluded the admission of evidence that certain of the defendants had refused to answer questions posed to them in the course of an investigation by the Federal Bureau of Investigation (the "FBI") of the encounter. Ricketts was also prevented from introducing Moore's and Williams' hospital records, or any evidence concerning the alleged altercation between Williams and the officers, as well as evidence relating to a citizen's complaint made against Lupo nine months earlier which alleged that Lupo had called the complainant a "black bastard" and threatened to "punch [his] face in."

Further, the district court precluded evidence of a meeting among various police officers, union representatives, and attorneys at which the officers allegedly agreed to cover up the incident and engage in a conspiracy of silence. This exclusion was consistent with the district court's prior ruling striking paragraph nineteen of Ricketts' third amended complaint, which states: "After the incident described above, the officers involved entered into a conspiracy of silence with each other to prevent the disclosure of the facts of the incident in order to immunize themselves from prosecution and to assure the denial of the Plaintiff's civil rights."

The district court explained its exclusion of all of this evidence in its ruling on Ricketts' motion for a new trial, as follows:

> The court properly excluded this evidence. At trial, the issue was whether or not the defendant police officers arrested the plaintiff without probable cause and whether or not they used excessive force in effecting that arrest. Neither the written responses of the defendants to questions posed by IAD regarding the beating of Moore and Williams nor Lupo's and Fallon's alleged silence before the FBI are relevant to that issue. The same is true of the hospital records of Moore and Williams. Similarly, the court properly excluded evidence that the defendants attended a meeting at the law offices of their union attorneys as irrelevant. The fact that the defendants wrote answers to questions posed by IAD was also not probative of the issue in this case. Under the Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872–73, 104 L.Ed.2d 443 (1989), ... the court properly excluded evidence of any defendant's subjective intent. For that reason, the court properly disallowed evidence concerning Lupo's alleged "black bastard" statement and Cherniack's reference to the incident as "a good one." In none of these instances of exclusion were "substantial rights" of the plaintiff affected, as required under Fed.R.Civ.P. Rule 61 to mandate a new trial. *See Monarch*

---

**2.** The officers were required to answer the following questions:

 1. Did you see any of the three accused [i.e., Moore, Williams, and Ricketts] get struck or kicked by the officers, if so who was struck or kicked and by what officer?

 2. How did Timothy Moore receive his injuries?

 3. What officer or officers struck or kicked Timothy Moore?

 4. What officer or officers struck or kicked Garnett Williams other than officer Salvatore Gallo?

 5. What officer or officers struck or kicked Lorenzo W. Rickett [sic]?

*Insurance Company of Ohio v. Insurance Corporation of Ireland Limited,* 835 F.2d 32, 35 (2d Cir.1987).

*Ricketts II,* slip op. at 9.[3]

### 3. *The Verdict and Judgment.*

The case was tried to a jury, which rendered a verdict adverse to Ricketts. As indicated above, Ricketts moved for a new trial on various grounds, and the district court denied the motion and entered judgment in favor of the defendants. *See supra* note 1.

This appeal followed.

### Discussion

We first address Ricketts' contention that the selection of the jury venire violated his right to equal protection, and then proceed to consider his allegations of evidentiary error.

### A. *The Jury Venire.*

In *Jackman,* which was decided after oral argument in this case, we reversed the defendant's criminal conviction under the Sixth Amendment. We noted that "[o]n its face, the procedure adopted by the jury clerk to remedy the problem disclosed in *Osorio* appears to constitute systematic—though perhaps unintentional—exclusion." 46 F.3d at 1244. Although we did not specify that any particular remedy was required, we stated that "[w]hatever procedure was used, effective steps needed to be taken to assure that the pool from which names for venires would be drawn would no longer reflect the underrepresentation that *Osorio* had disclosed." *Id.* at 1245.

We then applied the three-part test that is used to determine whether a defendant challenging a jury venire has established a prima facie violation of the Sixth Amendment. "[A] defendant must prove that: (1) the group claimed to be excluded is distinctive in the community, (2) the representation of the group in the jury pool is not fair and reasonable in relation to the number of members of the group in the community, and (3) the underrepresentation is the result of system-

atic exclusion of the group in the jury selection process." *Id.* at 1245–46 (citing *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579 (1979)). We also noted, however, that "[t]he defendant need not prove discriminatory intent on the part of those constructing or administering the jury selection process." *Id.* at 1246 (citing *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26; *Alston v. Manson,* 791 F.2d 255, 258 (2d Cir.1986), *cert. denied,* 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987)). We concluded that the defendant had established each of the required elements, and that the government had failed to demonstrate a significant interest in the procedure used, resulting in a Sixth Amendment violation. *Id.* at 1246–48.

Because Ricketts is a civil litigant, rather than a criminal defendant, he posits his claim of systematic exclusion of minority jurors as a violation of the Fifth Amendment's equal protection component. Indeed, the Sixth Amendment applies by its terms only to "criminal prosecutions," and does not govern civil trials. Thus, for example, *Jackman* explicitly concluded that the jury selection procedures used in that case "violate[d] the Sixth Amendment's fair cross-section guarantee," 46 F.3d at 1242, and just as explicitly eschewed consideration of an equal protection claim that Jackman had presented to the district court, and whose consideration on appeal was urged by *amici curiae. Id.* at 1242 n. 1.

 It is well established that a claimant under the Fourteenth Amendment's Equal Protection Clause or the corresponding component of the Fifth Amendment must establish intentional discrimination. *See McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1766–67, 95 L.Ed.2d 262 (1987) (stating general proposition that a party alleging an equal protection violation must prove " 'the existence of purposeful discrimination' ") (quoting *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967)). Accordingly, we have made it clear that "equal protection ... condemns

---

**3.** Ricketts also challenged the district court's jury instructions, and contended that the verdict was against the weight of the evidence. The district court disagreed, *Ricketts II,* slip op. at 9–11, and Ricketts does not pursue these contentions on appeal.

underrepresentation of minorities *only if* it is the product of intentional discrimination." *Alston,* 791 F.2d at 257 (emphasis added); *see also Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) ("To prove an equal protection violation, claimants must prove purposeful discrimination...."); *United States v. Gelb,* 881 F.2d 1155, 1161 (2d Cir.) ("[T]he equal protection clause of the fourteenth amendment prohibits underrepresentation of minorities in juries by reason of intentional discrimination...."), *cert. denied,* 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989); *see also Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,* 801 F.2d 13, 28 (2d Cir.1986) ("In the present [civil] case, since there was no *per se* exclusion of any group, and no systematic and intentional discrimination against any person or persons, the district judge's empanelment procedure was not unconstitutional."), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *cf. Thiel v. Southern Pac. Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 985–86, 90 L.Ed. 1181 (1946) (invoking Court's supervisory power over federal judicial system to declare that "[t]he American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community.... [P]rospective jurors shall be selected by court officials without systematic and intentional exclusion....").

Accordingly, while "[t]he sixth amendment ... forbids any substantial underrepresentation of minorities, regardless of whether the State's motive is discriminatory[,] [t]he fourteenth amendment ... imposes the additional requirement of discriminatory purpose." *Alston,* 791 F.2d at 258–59. A party alleging a Fifth Amendment violation who establishes each element of the three-part test articulated in *Jackman* raises only a *"presumption* of discriminatory intent." *Id.* at 258 (emphasis added); *see also Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26 (in equal protection, as opposed to Sixth Amendment, context, evidence of discriminatory effect "is subject to rebuttal evidence either that discriminatory purpose was not involved or that such purpose did not have a determinative effect").

Judge Covello conducted a pretrial hearing on September 21, 1993 in *Jackman* regarding the defendant's challenge to the jury selection in that case. Only one witness testified, the jury administrator in the Hartford district court who assembled the venire panel from which both the Jackman and Ricketts juries were selected. The direct examination by Jackman's attorney established the Sixth Amendment violation which led to the reversal of Jackman's conviction by this court. The government's cross-examination established that the jury administrator had never intentionally excluded any potential juror from selection on account of race, or because "they were black or of Puerto Rican descent." Judge Covello found an absence of systematic exclusion in view of the corrective measures that had been taken to address the Hartford jury selection problem uncovered in *Osorio,* a determination that we reversed in *Jackman.*

One week later, on September 28, 1993, Judge Covello conducted a hearing regarding Ricketts' pretrial motion to strike the previously selected jury in this case. At the instance of Ricketts, the court took judicial notice of the testimony provided by the jury administrator a week earlier at the *Jackman* hearing, and the transcript of that hearing was introduced as an exhibit. No further testimony or evidence was introduced at the *Ricketts* hearing. After hearing argument, Judge Covello ruled that (1) the motion to strike was untimely, (2) the panel included "representatives from all of the communities, including Hartford and New Britain," and (3) "there simply has been no showing of an intentional discrimination here or any discriminatory purpose in the way that the jury selection process was carried out."

 Ricketts renewed his challenge to the jury selection in his posttrial motion for a new trial. Judge Covello noted that "all parties agreed" that the original computer error was inadvertent, *Ricketts II,* slip op. at 6, also observed "that the jury administrator used a corrected list as a supplement to the flawed list when choosing jurors," *id.* at 8 n. 8, and ruled that no Fifth Amendment violation had resulted because:

[T]he evidence at the hearing established that, while minorities were underrepresented in the pool of names from which the jury administrator chose, that flaw was not the result of intentional discrimination. The evidence clearly established that the mistake was inadvertent and that, until the hearing itself, the jury administrator believed that she was following the correct procedure. Any underrepresentation of minorities on the venire from which [Ricketts'] jury was selected, therefore, was not a violation of [Ricketts'] Fifth Amendment rights.

*Id.* at 8.

On appeal, Ricketts fails even to contend that the underrepresentation of minorities on his jury resulted from their intentional exclusion. In any event, the record provides no support for such an argument.[4] Accordingly, we affirm the district court's rejection of Ricketts' Fifth Amendment challenge to the jury selection in this case.

### B. *Evidentiary Claims.*

#### 1. *The Tape.*

We begin with the tape containing the statement "[r]un him over." As noted earlier, the district court found that Ricketts was unable to authenticate the tape. Specifically, the court stated: "The court heard Davis testify extensively. After listening to the tape the court was not satisfied that the voice on the tape was that of Davis." *Ricketts II,* slip op. at 4.[5]

Three provisions of the Federal Rules of Evidence are implicated. Fed.R.Evid. 901(a) provides:

(a) **General provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

The other two provisions are set forth in Fed.R.Evid. 104:

(a) **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

(b) **Relevancy conditioned on fact.** When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

Finally, an advisory committee note to Rule 901 states that: "Authentication and identification represent a special aspect of relevancy.... This requirement of showing authenticity or identity falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b)."

We explained the interaction of these rules in *United States v. Sliker,* 751 F.2d 477, 496–500 (2d Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832, 471 U.S. 1137, 105 S.Ct. 2679, 86 L.Ed.2d 697 (1985). *Sliker* involved a tape recorded conversation between two defendants, one of whom testified. When asked by the prosecutor about the conversation, he claimed that he could not recall that it had taken place, even after he had listened to the tape. *Id.* at 496–97. When asked if he recognized his own or his codefendant's voice on the tape, he answered,

---

4. Our dissenting colleague invokes *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), and *Alston, supra,* to argue that the substantial underrepresentation of black and Hispanic residents of Hartford and New Britain "establishes a prima facie case of discriminatory purpose that violates equal protection" and "has not been refuted by the government." In both *Castaneda* and *Alston,* however, the engine of discrimination was a considered governmental policy, rather than the series of mishaps and botches (explicitly devoid, in the case of the jury administrator's aborted correction of the jury wheel, of discriminatory purpose) evidenced by the record in this case.

5. It would not be surprising that Davis' voice on the tape would differ from his voice on the witness stand. Davis was chasing the younger Moore for a considerable distance, and was surely neither breathing in a relaxed mode nor speaking in his normal voice during that chase.

respectively, "I never heard myself on tape," and "[n]ot that much." *Id.* at 497 (alteration in *Sliker*). The prosecutor then offered the tape, and the district court admitted the tape after listening to it. In determining that the question of authentication was primarily for the jury to determine, we undertook an examination of the relevant rules:

[S]ubsection (a) [of Fed.R.Evid. 104] governs questions concerning the competency of evidence, i.e., evidence which is relevant but may be subject to exclusion by virtue of some principle of the law of evidence, leaving it for the judge to resolve factual issues in connection with these principles.... Removing factual issues related to determining whether evidence is competent from the jury is based on recognition that the typical juror is intent mainly on reaching a verdict in accord with what he believes to be true in the case he is called upon to decide, and is not concerned with the long term policies of evidence law.

Subsection (b) provides different treatment for situations in which the *relevancy* (i.e., probative value) of evidence, rather than its *competency,* depends upon the existence of a prior fact....

The requirement that a given piece of evidence be what its proponent claims does not reflect some special evidentiary policy like hearsay rules or privileges.... Authentication is perhaps the purest example of a rule respecting relevance: evidence admitted as something can have *no* probative value unless that is what it really is. *Cf.* Notes of Advisory Committee to Rule 901(a). Thus, the Notes of the Advisory Committee accompanying Rule 901 state that questions concerning authentication are governed by the procedures in Rule 104(b).

Under Rule 104(b), the trial judge may make a preliminary determination as to the prior fact and admit the evidence to the jury's final determination that the prior fact exists....

The judge's preliminary determination does not, however, finally establish the authenticity of the tape. As with other matters under Rule 104(b), only the jury can finally decide that issue. The judge's ad-

mission of the evidence under Rule 104(b) is conditional and "subject to the introduction of evidence sufficient to support a finding of the fulfillment of the condition." F.R.E. 104(b)....

F.R.E. 901(a) requires "evidence sufficient to support a finding that the matter in question is what its proponent claims," but does not definitively establish the nature or quantum of proof that is required. *Cf.* F.R.E. 901(a), (b), Notes of Advisory Committee. Subsection (b) provides illustrations of what will suffice. Subsection (b)(5), dealing specifically with the question of voice identification, states that "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording," can be established "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." [The defendant] argues that the opinion referred to must be that of a witness and not that of the trier of the fact, and the Notes of the Advisory Committee suggest that this is so, as does Judge Weinstein, 5 [Jack B. Weinstein and Margaret A. Berger,] Weinstein's Evidence, ¶¶ 901(b)(5)[01], [02] [ (1982) ]. However, subsection (b)(5) is only an illustration and several of the other illustrations do not require opinion testimony and leave it to the jury to make its own comparison.... We thus see no reason in principle why, in a case like this, where the person whose voice on a tape [that] is to be identified has testified, the jury cannot itself make the comparison....

*Sliker,* 751 F.2d at 498–500 (alterations partly added) (citations partly omitted).

■ This case differs somewhat from *Sliker* in that the district court in *Sliker* *admitted* the tape, whereas in this case the court *excluded* the tape. Nevertheless, our discussion in *Sliker* of the principles of authentication, and of the different policies advanced by subsections (a) and (b) of Rule 104, makes clear that the comparison of a tape-recorded voice and the voice of a witness is primarily a matter for the jury. While *Sliker* did not entirely remove a judge's ability to exclude a tape on authentication grounds, the judge's

discretion to do so is limited to a determination whether " 'sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.' " *United States v. Ruggiero,* 928 F.2d 1289, 1303 (2d Cir.) (quoting 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 901(a)[01], at 901–17 (1990)), *cert. denied,* 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991).

■ The district court's determination that it "was not satisfied that the voice on the tape was that of Davis," *Ricketts II,* slip op. at 4, is inconsistent with these principles. So long as a jury is entitled to reach a contrary conclusion, it must be given the opportunity to do so. The tape reveals that the dispatcher was engaged in an exchange with an officer who was pursuing Moore and identified himself as unit 124. At one point during the exchange, the dispatcher said "[d]on't give up Rob," a probable reference to Rob Davis. A short time thereafter, a voice said: "Run him over." Moreover, Ricketts testified that Davis said later at the hospital: "[I]f he had his way he wouldn't chase the kid [Moore], he ... would have run him over with the car." Although we do not have the benefit of having heard Davis testify, given these facts, and that the jury did hear him testify, we believe that the district court erred in excluding the tape on authentication grounds without making a finding that no rational juror could have concluded that Davis made the statement at issue.

Nevertheless, the district court also indicated that it would have excluded the tape in any event. The court reasoned that Davis' intent towards Moore is not relevant to his intent towards Ricketts, and relied upon *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), for the proposition that subjective intent is not relevant to the question whether excessive force was used. *Ricketts II,* slip op. at 5.

Ricketts presses two bases on which this evidence should have been admitted. First, he argues that the statement impeaches the credibility of Davis and the other defendants. Second, he argues that the evidence, which establishes Davis' subjective intent toward Moore—and ostensibly Ricketts—is relevant

to his state law claims and his claim for punitive damages.

■ In *Graham,* the Supreme Court set forth when evidence of subjective intent may be relevant to a determination whether the police used excessive force in arresting an individual:

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight....

As in other Fourth Amendment contexts, ... the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, *without regard to their underlying intent or motivation.* An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

.... [A test that] requires consideration of whether the individual officers acted in "good faith" or "maliciously and sadistically for the very purpose of causing harm," is incompatible with a proper Fourth Amendment analysis. We do not agree with the Court of Appeals' suggestion that the "malicious and sadistic" inquiry is merely another way of describing conduct that is objectively unreasonable under the circumstances. Whatever the empirical correlations between "malicious and sadistic" behavior and objective unreasonableness may be, the fact remains that the "malicious and sadistic" factor puts in issue the subjective motivations of the individual officers, which our prior cases make clear ha[ve] no bearing on whether a particular seizure is "unreasonable" under the Fourth Amendment....

490 U.S. at 396–97, 109 S.Ct. at 1871–73 (emphasis added) (citations omitted); *see also Anderson v. Branen,* 17 F.3d 552, 558–59 (2d Cir.1994); *Calamia v. City of New York,* 879 F.2d 1025, 1033–35 (2d Cir.1989).

■ However, the Supreme Court has recognized two exceptions to this rule.

First, as explained in a footnote in *Graham,* "in assessing the *credibility of an officer's account of the circumstances that prompted the use of force,* a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen." 490 U.S. at 399 n. 12, 109 S.Ct. at 1873 n. 12 (emphasis added). Second, punitive damages are generally available in an action pursuant to 42 U.S.C. § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); *see also Jeffries v. Harleston,* 21 F.3d 1238, 1249 (2d Cir.), *vacated on other grounds,* —— U.S. ——, 115 S.Ct. 502, 130 L.Ed.2d 411 (1994). Punitive damages are also available under Connecticut law when "wanton or wilful malicious misconduct" is proven. *Markey v. Santangelo,* 195 Conn. 76, 485 A.2d 1305, 1307 (1985); *see also Bates v. McKeon,* 650 F.Supp. 476, 481–82 (D.Conn.1986).

Applying these standards to this case, it is clear that Davis' alleged exhortation to "[r]un [Moore] over" has no bearing on whether Davis (or others) used an amount of force against Ricketts that was objectively unreasonable in light of the circumstances, and Ricketts does not contend otherwise. However, the credibility of Davis' account of the circumstances leading up to his use of force was at issue, and *Graham* certainly contemplates that juries will consider bias or other ill will in assessing an officer's credibility.

Fed.R.Evid. 608(b) does not pose a bar to admitting the tape on these grounds. That rule generally precludes proof by extrinsic evidence of "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609." We have determined, however, that this rule does not operate to require the exclusion of impeachment evidence that demonstrates the witness' bias, as opposed to his character for untruthfulness. *See United States v. Atherton,* 936 F.2d 728, 733 (2d Cir.1991) (collecting cases), *cert. denied,* 502 U.S. 1101, 112 S.Ct. 1187, 117 L.Ed.2d 429

(1992). This exception to Rule 608(b) appears to be consistent with the Supreme Court's statement in *Graham* that the jury may "consider … evidence" of an officer's ill will as it relates to his credibility. 490 U.S. at 399 n. 12, 109 S.Ct. at 1873 n. 12.

■ Admission of the tape would permit an argument that because, in the heat of a lengthy chase of a suspect, Davis uttered a statement that reveals bias against that suspect, Davis' account of the circumstances that led to his use of force against Ricketts is not credible. While the district court would not have abused its discretion in *admitting* this evidence, we perceive no abuse of discretion in its decision to exclude the evidence, particularly in light of Ricketts' vigorous cross-examination of all of the officers, including Davis, whose testimony and incident reports were shown to be inconsistent.

■ In any event, Fed.R.Evid. 103(a) counsels that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." As we stated in *Malek v. Federal Insurance Co.,* 994 F.2d 49, 55 (2d Cir. 1993):

We only will reverse where the improper admission or exclusion of evidence affects "a substantial right" of one of the parties. Fed.R.Evid. 103(a); *see* 28 U.S.C. § 2111 (1988); Fed.R.Civ.P. 61. Making this determination involves an "assessment of the likelihood that the error affected the outcome of the case." *Jordan v. Medley,* 711 F.2d 211, 218 (D.C.Cir.1983) (Scalia, J.) (citing *United States ex rel. D'Agostino Excavators, Inc. v. Heyward Robinson Co.,* 430 F.2d 1077, 1083 (2d Cir.1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971)).

We conclude that there is little likelihood that admission of the tape recording would have affected the outcome of the trial. We note also that with respect to Ricketts' claims for punitive damages, because we uphold the jury's verdict as to the use of excessive force in the first instance, the erroneous exclusion of evidence relevant to the secondary question whether punitive damages are warranted would be harmless.

## 2. Evidence Relating to Police Brutality towards Moore and Williams.

As previously noted, the district court precluded the admission of the officers' answers to the IAD questions (insofar as they relate to Moore and Williams) as collateral to whether Ricketts was arrested without probable cause or subject to excessive force. *See supra* note 2 and accompanying text. The same rationale was provided with respect to the exclusion of the police incident reports and hospital records. *See Ricketts II*, slip op. at 9.

Ricketts argues that "this evidence was critical in assessing the credibility of the witnesses," and relies upon footnote 12 of *Graham*, quoted earlier. He notes that each side presented a markedly different version of what events transpired, thus enhancing the importance of witness credibility, and argues that evidence of Moore's and Williams' injuries would impeach the officers' statements that they did not use excessive force against those individuals; once impeached, their account of the force used against Ricketts would also be called into question.

■ We begin with the evidence relating to Moore. It is unclear how the admission of the police responses to the IAD questions or the officers' incident reports would have assisted Ricketts' case. As Ricketts states in his appeal brief: "Defendants ... testified that they did not hit, punch or kick Moore." Their responses to the IAD questionnaires that were prompted by Ricketts' complaint were universally consistent with that testimony. The officers' incident reports, which contain narrative descriptions of the incident, are similarly consistent with the trial testimony insofar as they address the issue of Moore's injuries. Moreover, Ricketts was allowed to cross-examine the officers quite vigorously concerning inconsistencies between their written statements and their trial testimony concerning the encounter with Ricketts. Because a basis for similar cross-examination with respect to Moore is not apparent, Ricketts succeeded in utilizing the officers' statements to the fullest available advantage.

■ Moore's hospital report, on the other hand, is simply not admissible under Fed. R.Evid. Rule 608(b). Ricketts sought to offer the hospital records solely in order to impeach the officers' testimony that they did not use excessive force against Moore. Unlike Davis' alleged statement "[r]un him over," from which an inference of bias might be drawn, the hospital records were offered to prove only that the officers were untruthful generally, and therefore that their account of what occurred with Ricketts should not be believed. However, extrinsic evidence of conduct to attack credibility is not admissible.

■ Finally, we note that the hospital report reveals that Moore suffered a laceration to his forehead that required sutures, and a fracture of a finger on his left hand, but "denie[d] any blurred vision, nausea [or] vomiting." The examining physician concluded that the fracture may have been an old injury because of the lack of soft tissue swelling at the location of the fracture. Although we conclude that this evidence was inadmissible, we also note that its exclusion did not affect Ricketts' substantial rights. The injuries described appear to be far more consistent with those that would result during a struggle to resist arrest than those that would result during the type of brutal and relentless beating recounted by most of Ricketts' witnesses.

■ Turning to the evidence concerning the alleged use of excessive force against Williams, we find no fault with the district court's determination to preclude the use of this evidence as collateral. The incident with Williams occurred after Moore and Ricketts had been subdued and arrested. Ricketts' proffer was that a number of the officers at the scene then attacked Williams without provocation. Gallo stated in his response to the IAD questions and incident report that he had struck Williams with his nightstick in self-defense and in order to subdue him after Williams had aggressively attacked him.

Ricketts argues that the proffered evidence would have impeached the officers' credibility and was admissible under Fed. R.Evid. 404(b) to show pattern, intent, and

absence of mistake.[6] Again, Rule 608(b) precludes the introduction of extrinsic evidence solely to attack credibility. Further, intent is irrelevant to the primary question whether excessive force was used, and the defendants did not assert a defense of mistake. In any event, the district court did not abuse its broad discretion in determining that a trial within a trial concerning the subsequent engagement with Williams would have been more confusing than helpfully probative, particularly because the trial already involved a minitrial concerning the altercation with Moore. *See United States v. Smith,* 727 F.2d 214, 220 (2d Cir.1984) ("Since the trial judge is in the best position to evaluate the evidence and its effect on the jury, he is given broad discretion in making [a ruling regarding similar act evidence]. . . . To find abuse [of that discretion], the appellate court must conclude that the district judge acted arbitrarily and irrationally."); *United States v. Aboumoussallem,* 726 F.2d 906, 912–13 (2d Cir.1984) (affirming exclusion of otherwise relevant similar act evidence under Rule 403 in deference to trial court's discretionary judgment that confusion and delay caused by trial within a trial would have substantially outweighed probative value of evidence).

### 3. *The Citizen's Complaint against Lupo.*

We also perceive no abuse of discretion in the district court's decision to preclude Ricketts from inquiring into a prior citizen's complaint made against Lupo. Ricketts argues that the evidence was relevant to demonstrate Lupo's ill will towards black people, thus calling his credibility into question. He also urges admissibility under Fed.R.Evid. 404(b). *See supra* note 6.

We do not believe that the district court abused its broad discretion in precluding inquiry into this alleged event. As previously noted, proof of intent plays a limited role in this case, and Rule 608(b) would preclude the admission of this evidence solely to attack Lupo's credibility. In any event, "[w]e would consider it an abuse of discretion to admit [similar act] evidence if the other act were not sufficiently similar to the conduct at issue." *United States v. Peterson,* 808 F.2d 969, 974 (2d Cir.1987) (collecting cases). As Ricketts describes the incident involving Lupo, Lupo was on duty as a traffic officer at a construction site where the complainant, a black man, worked. According to the complainant, Lupo "indicated his dislike, working for black bastards" and told the complainant that "he would like to punch [his] face in." Lupo then arrested the complainant for breach of peace. The incident involved neither a lengthy chase of a suspect nor an allegation that Lupo or numerous other officers used excessive force against anyone. *See Berkovich v. Hicks,* 922 F.2d 1018, 1022 (2d Cir.1991) (affirming district court's decision to exclude evidence of seven prior complaints against police officer, alleged to be probative of a pattern of misconduct, because they did not "show the kind of *modus operandi* claimed in this case").

Moreover, the record does not reveal what findings were made or what action was taken, if any, with respect to the prior complaint. In *Berkovich,* the defendant officer had been exonerated of six of seven complaints that the plaintiff sought to admit under Rule 404(b). *Id.* at 1023. Noting " 'that the strength of the evidence establishing the similar act is one of the factors the court may consider when conducting the Rule 403 balancing,' " *id.* (quoting *Huddleston v. United States,* 485 U.S. 681, 689 n. 6, 108 S.Ct. 1496, 1501 n. 6, 99 L.Ed.2d 771 (1988)), we determined that:

> The earlier exoneration of [the defendant officer] on six of the seven prior complaints certainly lessens the probative value of [the] similar act evidence, tilting the scales further toward a finding of undue prejudice. The trial court therefore did not abuse its discretion in finding that the slight probative value of this evidence—as to a theory of motive, pattern or other less plausible theories of relevance—was sub-

---

**6.** Fed.R.Evid. 404(b) provides in pertinent part:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

stantially outweighed by its potential for prejudice.

*Id.*

While the record does not disclose whether Lupo has been exonerated of the prior charge, the relevance of a single unsubstantiated charge is obviously limited. Although we considered the utility of evidence of exonerated charges in *Berkovich* under Rule 403, it is equally proper to view this issue as one of relevance. *See Huddleston,* 485 U.S. at 689, 108 S.Ct. at 1501 ("[S]imilar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.").

For all of these reasons, we conclude that the district court's decision to preclude evidence concerning the prior complaint against Lupo was a proper exercise of its discretion.

### 4. The Alleged Conspiracy of Silence.

Ricketts contends that the district court improperly: (1) struck paragraph nineteen of his third amended complaint; and (2) precluded him from presenting evidence concerning: (a) a meeting attended by the defendant officers at the law offices of their union attorneys; and (b) the existence of the IAD and FBI investigations.[7] Paragraph nineteen was a successor to paragraph twenty-two of the second amended complaint, which charged that Quigley and Dumas, officers of the HPU, "engineered and orchestrated" a "conspiracy of silence" among the police officers by advising them to invoke the privilege against self-incrimination and to limit their answers to the IAD by failing to disclose relevant information within their knowledge. Summary judgment was awarded in favor of Quigley and Dumas regarding these claims in *Ricketts I, see supra* note 1, a ruling that is not challenged on this appeal.

Paragraph nineteen of Ricketts' third amended complaint alleged (much more succinctly than paragraph twenty-two of the second amended complaint and without any mention of Quigley or Dumas) that: "After the [Moore/Ricketts incident], the officers in-

volved entered into a conspiracy of silence with each other to prevent the disclosure of the facts of the incident in order to immunize themselves from prosecution and to assure the denial of the Plaintiff's civil rights." The defendants moved to strike this paragraph from the third amended complaint pursuant to Fed.R.Civ.P. 12(f), which authorizes a court to "order stricken from any pleading ... any redundant, immaterial, impertinent, or scandalous matter," claiming that Ricketts' "attempt to alter the scope of evidence to be produced at trial by recasting this nebulous and meritless conspiracy claim against the remaining defendants is inconsistent with [the district court's] ruling on summary judgment" in *Ricketts I.* The district court granted the motion by an endorsement on the defendant's motion on the eve of trial.

■ In our view, the motion should not have been granted, but the error does not call for reversal. The decision in *Ricketts I* granting summary judgment in favor of Quigley and Dumas did not preclude Ricketts from offering evidence of a conspiracy of silence. That decision simply held that there existed no disputed material facts that could result in the imposition of liability upon Quigley and Dumas for *engineering* a conspiracy of silence. Nothing in the opinion purports to resolve the question whether a conspiracy of silence existed at all.

Nonetheless, the ruling did not materially damage Ricketts' case. The responses of the defendant officers to the IAD questionnaires were introduced in evidence in redacted form. The heading on the first page of the questionnaires reads "NOTIFICATION OF CITIZENS COMPLAINT," and the subsequent text specifies Ricketts as the author of the complaint, but the words "INTERNAL AFFAIRS DIVISION," which appeared at the top of the heading on the original questionnaire, were redacted. The questions and answers regarding Moore and Williams were redacted, but the question and answer regarding the use of force against Ricketts remained. As previously noted, only the Ricketts exchanges provided any significant

---

**7.** Ricketts does not challenge on appeal the district court's preclusion of evidence concerning Lupo's and Fallon's refusal to speak with the FBI by invoking their Fifth Amendment rights. *See Ricketts II,* slip op. at 8–9.

conflicts with trial testimony for use in cross-examination and summation.

Ricketts' summation, furthermore, heavily emphasized the "conspiracy of silence" theme without objection or interruption by opposing counsel or the court, with recurring references to the defendants "having all got together to concoct a tale," T 1022, "engag[ing] in a cover up," "[getting] together and decid[ing] how to cover this whole thing up," and "the cover up, the stonewalling." The following passage pulled together and emphasized this thesis:

> And then you have this relationship between these officers, all of whom are covering up, lying. Gallo and Lupo are cousins. Cherniack is good friends with Gallo and Sanzo. They socialize together. Sanzo is driving unit 15, car 15, and who's with him? Gallo is in front, Cherniack is in the back. Davis and Pawlina are invited to Donovan's wedding a few weeks before Donovan gives his deposition and lies under oath.
>
> Nobody saw anything. I didn't see anything. I don't know what other officers were there. How many times did we hear that testimony? No one remembers who did what. How many times did we hear that testimony? This is a stonewalling, sticking together, because if we stick together, they're not going to believe the blacks, as long [as] we stick together.

The summation also made reference to Cherniack's "interview with Mr. Callahan," an FBI agent who interviewed Cherniack on March 16, 1988 to whom reference was made in the course of Cherniack's examination on that subject as "Agent Callahan." In addition, during questioning by Ricketts, several officers testified that all of the officers conferred about the incident in order to get their stories straight, and the examination of Fallon disclosed that the defendants met jointly at the offices of the HPU's lawyers to answer the questionnaires that were prompted by Ricketts' complaint.

We conclude that the jury was made fully aware that an internal investigation had ensued as a result of Ricketts' complaint concerning his seizure and arrest, and that the officers collaborated in their response to that investigation. Further, Ricketts' "conspiracy of silence" argument was presented forcefully to the jury. Accordingly, while we disagree with the district court's grant of the motion to strike paragraph nineteen of Ricketts' third amended complaint, we perceive no reversible error in that determination or related evidentiary rulings. *See* 28 U.S.C. § 2111 ("On the hearing of any appeal ..., the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); *see also* Fed.R.Civ.P. 61 ("No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order ... is ground for granting a new trial or for setting aside a verdict ... unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."). Ricketts was accorded a fair, although not perfect, trial. *See McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984) (collecting cases).

### Conclusion

The judgment of the district court is affirmed.

GODBOLD, Senior Circuit Judge, concurring in part and dissenting in part.

On the evidentiary issues I concur in Judge Mahoney's thorough opinion. On the equal protection issue, arising from selection of the jury venire, I respectfully dissent.

The decision of this court in *U.S. v. Jackman,* 46 F.3d 1240 (2d Cir.1995), requires a reversal. The jury venire issue in *Jackman* was decided on the same evidentiary record as in the present case. This court's decision in *Jackman* was handed down after briefing and oral argument of this case. Chief Judge Newman's *Jackman* opinion describes the scenario that began with a jury selection procedure that violated the Sixth Amendment. Hartford and New Britain, the two largest cities in the district, contained a ma-

jority of the Afro–American voting age residents and Hispanic voting age residents of the district. All residents of those cities were excluded from the jury pool. None was summoned to serve, indeed none was ever even sent a questionnaire. The clerk never received from the computer programmer a summons for any resident of those cities. The exclusion was systematic. *Id.* at 1244 and 1248.

The system was held unconstitutional in *U.S. v. Osorio,* 801 F.Supp. 966 (D.Conn. 1992). Afterwards the omission of Hartford residents was explained as a computer error. No explanation was ever offered for omission of New Britain residents. *Jackman,* 46 F.3d at 1243. The jury clerk pursued a remedy but the failure of the system was not corrected. She prepared a list by drawing names from the old, and defective, qualified wheel and then adding enough names from the newly qualified wheel to constitute a sufficient total. "Her remedy was bound to fail." *Jackman,* 46 F.3d at 1245. The remedy assured that the unrepresentativeness of the old list would significantly taint each new list. *Id.* Thus this case presents the unusual, if not unique, circumstance of an unconstitutional jury selection procedure followed by a proposed remedy that also fails, all done by the judicial system itself and within the same district, and of what the judicial system will do when a litigant is injured by those failures.

Ricketts, an Afro–American, is entitled to relief on a simple, straightforward ground. There is substantial underrepresentation of a cognizable group, the Afro–American and Hispanic residents of Hartford and New Britain, the cities where the largest numbers of those groups are concentrated. This establishes a prima facie case of discriminatory purpose that violates equal protection. *Alston v. Manson,* 791 F.2d 255 (2d Cir.1986), *cert. denied,* 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). That prima facie case has not been refuted by the government.

The district judge in this case initially denied relief on the ground there had been no showing of intentional discrimination.

This was an error of law. There was no burden on Ricketts to make such a showing. Rather it was the government's burden to overcome the prima facie case of discriminatory purpose. In denying Ricketts' motion for a new trial the district judge shifted his ground away from failure of proof of discrimination and ruled that in fact there was no intentional discrimination. The decision in *Jackman,* which was not available to the district judge, precludes this conclusion. It tells us that the government did not carry its burden:

> The government has provided *no justification* for failing to make the Jury Clerk's Pool more representative of the community, or for continuing to rely on the pre-*Osorio* old Qualified Wheel as the primary source of names, with only a sporadic supplementation unrelated to achieving proper representation.

*Jackman,* 46 F.3d at 1248. The same failure of the government to provide a justification, which led to a finding of a Sixth Amendment violation in *Jackman,* commands a finding of a Fifth Amendment violation in the present case. Different constitutional provisions are involved, but the facts create a presumption with respect to each. The failure of proof is the same in both cases because the record is the same.

In the present case the district judge made these significant findings: (1) All parties agree that the original error was inadvertent. This was not correct as to the exclusion of New Britain, which, as *Jackman* sets out, was never explained. (2) The clerk's mistake attempting to correct the system was inadvertent. This is not supported by the record, as *Jackman* tells us. On the same record, *Jackman* held:

> —The clerk's remedy was "bound to fail." It constituted systematic though *"perhaps* unintentional" exclusion. *Id.* at 1245.

> —It would "inevitably produce" a continuation of the underrepresentational effect. *Id.*

> —It assured that the unrepresentativeness of the old list would taint the new. *Id.*

—The remedial procedure was "facially inadequate." *Id.*

These findings do not even purport to constitute a finding of inadvertence. Rather this court declined to fix responsibility.

> In focussing on the clerk's actions, we do not mean to fault her individually or to fix responsibility for what occurred. Her *actions* are necessarily what we must review. But responsibility is another matter, one that is understandably not clear on this record, but is also of no relevance to the validity of appellant's contention. Since the inadequacy of the procedure used was plainly accomplished by action within the Court, what occurred presents a cognizable constitutional claim. The responsibility *might not be the clerk's at all,* it might be *someone else's* or, as often happens in overburdened courts (like other institutions), the failure to adopt a proper procedure *might have resulted simply from the unwarranted assumptions* by all concerned—in this instance, judges and staff—that the problem was being solved.

*Id.* at 1245 (emphasis added). This carefully limited decision that fault/responsibility is not being assessed, and on the record cannot be assessed, does not permit this court, on a second look at the same record, to hold that fault/responsibility can be assessed and then to proceed to make an assessment that what happened is just an inadvertence. The decision by the district judge in this case is understandable, because he did not have the benefit of the *Jackman* decision. We do.[1]

The approach of the district court in the present case is repeated in this court, which affirms on the ground that the record does not support intentional discrimination. That record, insufficient in *Jackman* to assign responsibility or justification for failures of the system, is insufficient here to explain away failures of the system as mere mishaps and botches, free of discriminatory purpose. On this simple, straightforward ground—failure of the government to rebut the relevant presumption—Ricketts is entitled to a reversal.

The opinion of this court in footnote 4 seeks to avoid the prima facie case that arises from application of *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), on the ground that *Castaneda* involved a "considered governmental policy," while the present case involves only the "mishaps and botches" devoid of discriminatory purpose. This effort is unavailing for two reasons. First, there was no considered governmental policy in *Castaneda.* Rather there was a substantial disparity consisting of egregious underrepresentation of Mexican–Americans from service as jurors, under a court-structured system that failed for reasons that were not explained. The facts are remarkably parallel to those before us. A "key man" system relied on jury commissioners appointed by a judge. They selected prospective grand jurors from the community at large and created a grand jury list. At defendant's federal habeas corpus hearing:

> The jury commissioners themselves, who were the only ones in a position to explain the apparent substantial underrepresentation of Mexican–Americans and to provide information on the actual operation of the selection process, were never called.

*Castaneda,* 430 U.S. at 491, 97 S.Ct. at 1278. The habeas court had recognized that the key man system was subjective, archaic and inefficient, but it doubted the reliability of the statistical evidence of exclusion and therefore held that the petitioner's prima facie case of invidious discrimination was rebutted. The Supreme Court restated the rule that a statistical showing supports the presumption of discrimination raised by a selection procedure that is susceptible of abuse. It noted that, inexplicably, the state had introduced no meaningful evidence, thus the prima facie case had not been rebutted. *Id.* at 498, 97 S.Ct. at 1282. Without evidence from the jury commissioners it was impossible to draw any inferences concerning reasons for exclusion of Mexican–Americans. The Court's decision was based not on the inefficiencies of the key man system but on the failure of the government to rebut. The present case is a replay of *Castaneda.*

---

1. While I do not explore it, maybe, just maybe, in the unusual context of this case, without exploration of the exact contours of "intentional" and "purposeful," the intentional acts of the court in the first instance, and in the abortive remedy, even if not done invidiously, constituted discrimination in violation of equal protection.

Second, the description of the failures in the present case as mere botches free of discriminatory purpose is a reincarnation of the basic fallacy of this court's decision. As discussed above, it is simply not available for this court to hold that the record shows that there was no purposeful discrimination but only innocent mistakes.

There has been an evident wrong to the plaintiff. Over his objection he was required to try his case before an illegally constituted jury, and he lost. He deserves better than to be told "tough luck." [2] This court might well wish to eschew debate over constitutional grounds and right the wrong on supervisory power grounds. That is what the Supreme Court did in *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). That case involved exclusion from the jury list of all persons who worked for a daily wage, done on the theory that they could not afford to serve and would not be likely to serve. There was no evidence of racial or other invidious discrimination. Nevertheless the Court described this as intentional, deliberate, and systematic exclusion. *Id.* at 223–24, 66 S.Ct. at 987–88. It reversed the trial court's refusal to strike the panel, "in the exercise of our power of supervision over the administration of justice and the federal courts," and "to guard against the subtle undermining of the jury system." *Id.* at 225, 66 S.Ct. at 988.

I would reverse on the equal protection ground and allow plaintiff a trial before a properly constituted jury.

**2.** The opinion of this court faults Ricketts for not contending that underrepresentation of minorities on his jury resulted from intentional exclusion. This seems to me over-technical. Ricketts' brief adequately raises the Fifth Amendment equal protection issue:

> II. The District Court Erred In Denying Plaintiff's Motion To Strike The Jury Because The Manner In Which The Venire Was Drawn Violated Plaintiff's Right To Equal Protection Pursuant To The Fifth Amendment Of The United States Constitution.

Brief, p. 46 (footnote omitted). The brief discusses the three elements set out in *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), required to make out a prima facie case of jury discrimination amounting to a denial of equal protection: (1) the court must determine whether the excluded group is cognizable; (2) the court must determine whether underrepresentation of the group is substantial; (3) the court must determine whether the method of jury selection is susceptible of abuse or not racially neutral. It discusses the facts that meet these criteria. A prima facie case of discrimination amounting to a denial of equal protection follows from meeting these criteria. A litigant is not required to incant the magic word "intentional."